IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DON R. ICKES,                )
                                  )      CIVIL ACTION NO. 3:13-208
                 Plaintiff,   )
                                  )      JUDGE KIM R. GIBSON
        v.                    )
                                  )
CRAIG GRASSMEYER; BARRY   )
AUGNST; THOMAS LASKEY;    )
STATE OF PENNSYLVANIA; RONALD   )
GIVLER; and TOWNSHIP OF     )
GREENFIELD,              )
                                  )
                 Defendants.  )

## MEMORANDUM OPINION

### I.      Introduction

This matter comes before the Court on two motions to dismiss filed by the Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 7 & 9). The motions collectively seek the dismissal of all claims brought by the Plaintiff. For the reasons that follow, both motions will be granted in part and denied in part.

### II.      Background[1]

Plaintiff Don R. Ickes ("Ickes") is a resident of Florida who occasionally travels to Pennsylvania because of family and business interests. (ECF No. 1-2 ¶ 1). On July 18, 2011, Ickes was driving a Ford Escort on Interstate 99. (*Id.* ¶ 9). He was traveling toward Osterburg, Pennsylvania. (*Id.*). Trooper Thomas Laskey ("Laskey"), a member of the Pennsylvania State Police ("PSP"), "stopped" the Ford Escort because of "alleged traffic

---

[1] Given the procedural posture of this case, the allegations in the Plaintiff's complaint are assumed to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

1

infractions" committed by Ickes. (*Id*.). At Laskey's request, Ickes "presented" certain documents relating to his identity. (*Id.* ¶ 10). Because he was "distrustful and fearful of Laskey, who had become menacing" throughout the encounter, Ickes "declined to exit the vehicle." (*Id*.).

Trooper Barry Augnst ("Augnst"), another member of the PSP, and Officer Ronald Givler ("Givler"), the Chief of the Greenfield Township Police Department, "showed up" to assist Laskey. (ECF No. 1-2 ¶ 11). Trooper Craig Grassmeyer ("Grassmeyer"), who had supervisory authority over Laskey and Augnst, arrived at the scene shortly thereafter. (*Id.* ¶ 12). After observing Ickes' apparent refusal to exit the Ford Escort, Grassmeyer "angrily and vulgarly 't[ook] charge'" of the situation and "order[ed] that Ickes be forcibly removed from his vehicle." (*Id*.). Laskey complied with Grassmeyer's order by "smashing" the window on the right front door of the Ford Escort. (*Id.* ¶ 13). "Ickes was dragged out of the vehicle" by Laskey and "another policeman," who pulled Ickes "over broken glass" and placed him on a "gravel road." (*Id.* ¶ 14). While Ickes was lying on the ground, his "hands were tightly cuffed behind his back, causing his wrists to bleed." (*Id.* ¶ 15). Laskey later started to transport Ickes "to the [PSP's] home barracks for processing." (*Id.* ¶ 16). Along the way, Laskey went to a nearby hospital. (*Id*.).

Criminal charges were later brought against Ickes for resisting arrest,[2] disorderly conduct,[3] harassment,[4] and several violations of Pennsylvania's Vehicle Code. (ECF No. 1-

---

[2] 18 Pa. Cons. Stat. § 5104.

[3] 18 Pa. Cons. Stat. § 5503(a).

2 ¶¶ 17–18). The harassment charges were apparently premised on communications between Ickes and Laskey's mother occurring after Ickes' arrest. (*Id.* ¶¶ 17–18). Ickes commenced a civil action against Laskey, Augnst, Givler, Grassmeyer, the Commonwealth of Pennsylvania ("Commonwealth") and the Township of Greenfield ("Township") in the Court of Common Pleas of Blair County on August 18, 2013, alleging numerous violations of the United States Constitution and Pennsylvania law. (*Id.* ¶¶ 19–34). Shortly thereafter, the criminal charges pending against Ickes proceeded to trial. On August 22, 2013, a jury convicted Ickes of resisting arrest and harassment. (ECF No. 7-2 at 2). The Court of Common Pleas also found him guilty of 14 summary offenses, including a lesser form of harassment,[5] and 13 violations of the Vehicle Code.[6] (*Id.* at 3–8). Ickes was acquitted of disorderly conduct and careless driving.[7] (*Id.* at 8).

On September 6, 2013, this action was removed from the Court of Common Pleas to this Court. The Commonwealth and Township have now filed separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[4] 18 Pa. Cons. Stat. § 2709(a).

[5] The jury found Ickes to be guilty of a form of harassment constituting a misdemeanor of the third degree. 18 Pa. Cons. Stat. § 2709(c)(2). The lessor form of harassment engaged in by Ickes constituted only a summary offense. 18 Pa. Cons. Stat. § 2709(c)(1).

[6] 75 Pa. Cons. Stat. §§ 1101(a), 1103.1(b), 1301(a), 1311(b), 1372, 1511(a), 1543(a), 1573(a), 1786(f), 3325(a), 3362(a), 4703(a), 6308(a).

[7] 75 Pa. Cons. Stat. § 3714.

### III. Standard of Review

In light of the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard requires more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The complaint must allege a sufficient number of facts "to raise a right to relief above the speculative level." *Id.* This requirement is designed to facilitate the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added).

When considering a Rule 12(b)(6) motion, a court accepts all of the plaintiff's allegations as true and views all reasonable inferences drawn from those allegations in the light most favorable to the plaintiff. *Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the

complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989). In addition to the allegations contained in the complaint, a court may consider matters of public record, exhibits attached to the complaint, and other items appearing in the record of the case. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).

## IV.     Jurisdiction and Venue

The Court has jurisdiction over Ickes' federal constitutional claims under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Ickes' claims arising under Pennsylvania law. Venue is proper under 28 U.S.C. § 1391(b).

## V.     Discussion

Ickes brings his constitutional claims pursuant to 42 U.S.C. § 1983, which provides aggrieved individuals with a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. This statutory provision does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129 n.11 (1980). Redress under § 1983 must be premised on an underlying violation of a federal constitutional or statutory right. *Toth v. California University of Pennsylvania*, 844 F. Supp. 2d 611, 647 (W.D. Pa. 2012).

The first step of the analysis is to "identify the exact contours of the underlying right[s] said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). Ickes' federal claims all appear to be premised on alleged violations of rights grounded directly in the Constitution. (ECF No. 1-2 ¶ 34). Each claim will be considered separately.[8]

## A.      The Constitutional Claims Asserted Against the Commonwealth

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amend. XI. Despite the relatively narrow reach of this language, the Eleventh Amendment has been understood by the Supreme Court "to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991). "This presupposition is based on the understanding that 'the States entered the federal system with their sovereignty intact,' that '[t]he Judicial power of the United States' is limited by this sovereignty, and that a State will not be subjected to suits in federal court brought by private individuals unless it

_____

[8] The Defendants broadly argue that Ickes' constitutional claims are barred by the rule announced in *Heck v. Humphrey*, 512 U.S. 477 (1994). (ECF No. 8 at 8–11; ECF No. 10 at 6–9). That rule bars a certain category of claims that, if successful, "would necessarily imply the invalidity" of a plaintiff's criminal conviction or sentence. *Heck*, 512 U.S. at 487. It does not bar every claim related to the events upon which the plaintiff's conviction and sentence are based. *Skinner v. Switzer*, S. Ct. 1289, 1298–99 (2011). The application of *Heck*, like the other disputed issues in this case, can only be considered in relation to a specific claim. *Lora-Pena v. Federal Bureau of Investigation*, 529 F.3d 503, 505–06 (3d Cir. 2008).

has consented to such suits either expressly or in the 'plan of the convention.'"[9]  *Burns v. Alexander*, 776 F. Supp. 2d 57, 72 (W.D. Pa. 2011) (quoting *Blatchford*, 501 U.S. at 779).

Congress has the constitutional authority to "enforce" the substantive provisions of the Fourteenth Amendment through the enactment of remedial or prophylactic legislation.  U.S. Const., Amend. XIV, § 5; *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 727–28 (2003).  In certain instances, Congress can use this power to abrogate the States' Eleventh Amendment immunity and subject them to suits brought by private individuals.  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).  In taking that action, however, Congress must make its intention to abrogate the States' immunity from suit "unmistakably clear in the language of the statute" authorizing the category of civil actions at issue.  *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985).  In *Quern v. Jordan*, 440 U.S. 332, 342–43 (1979), the Supreme Court declined to read the "general language" of § 1983 as an abrogation of the States' Eleventh Amendment immunity.  The Supreme Court later held, in *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65–66, 71 (1989), that the States were not "persons" amenable to suit under § 1983.

The Commonwealth has not waived its Eleventh Amendment immunity by statute.  42 Pa. Cons. Stat. § 8521(b).  Nevertheless, the Commonwealth arguably waived that immunity by concurring in the decision of the Township parties to remove the instant

---

[9] Since Ickes describes himself as a "resident" of Florida, this action appears to fall within the precise language of the Eleventh Amendment.  (ECF No. 1-2 ¶ 1).  In any event, the Eleventh Amendment bars suits brought against non-consenting States by both in-state plaintiffs and out-of-state plaintiffs.  *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 254 (3d Cir. 2010).  It has long been understood that the text of the Eleventh Amendment "does not define the scope of the States' sovereign immunity."  *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743, 753 (2002).

action to this Court. *Lombardo v. Commonwealth of Pennsylvania*, 540 F.3d 190, 196–98 (3d Cir. 2008). With respect to Ickes' constitutional claims, however, that issue is inconsequential. Given the holding in *Will*, Ickes cannot sue the Commonwealth under § 1983 even if it is assumed that the removal of this action effected a waiver of the Commonwealth's Eleventh Amendment immunity. *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 617 (2002).

A plaintiff bringing a personal-capacity claim against a governmental official seeks to hold the official personally liable for his or her misconduct. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "An award of damages entered against a personal-capacity defendant can be executed only against his or her 'personal assets.'" *Douglas v. Brookville Area School District*, 836 F. Supp. 2d 329, 353 (W.D. Pa. 2011) (quoting *Graham*, 473 U.S. at 166). A defendant sued in his or her personal capacity "may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). An official-capacity claim against a governmental official seeks to impose liability on the entity that he or she represents. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). An award of damages entered against an official-capacity defendant can be executed only against the governmental entity of which he or she is an agent. *Douglas*, 836 F. Supp. 2d at 353. A defendant sued in his or her official capacity may invoke only the immunities available to the employing governmental entity. *Hafer*, 502 U.S. at 25. The distinction between personal-capacity claims and official-capacity claims turns on the capacity in which a defendant has been *sued* rather than on the capacity in which he or she has *acted*.

*Burns*, 776 F. Supp. 2d at 72 n.14.  A governmental official can be held *personally* liable under § 1983 for his or her *official* misconduct.  *Hafer*, 502 U.S. at 27–31.

In his complaint, Ickes does not explain whether he is attempting to proceed against Laskey, Augnst, and Grassmeyer in their personal or official capacities.  (ECF No. 1-2 ¶¶ 2-5).  Since an official-capacity suit against a state official "is no different from a suit against the State itself," those individuals are not "persons" amenable to suit under § 1983 to the extent that they have been sued in their official capacities.[10]  *Will*, 491 U.S. at 71.  Accordingly, all claims asserted against the Commonwealth—including those against Laskey, Augnst, and Grassmeyer in their official capacities—will be dismissed.

**B.      The First Amendment Claims**

The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const., Amend. I.  The Fourteenth Amendment prohibits a State from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const., Amend. XIV, § 1.  The "freedom of speech," which is "secured by the First Amendment against abridgement by the United States," is "among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgement by a State."  *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940).

---

[10] "A state official sued in his or her official capacity for prospective relief is a 'person' within the meaning of § 1983, since an official-capacity action brought against a state official by a plaintiff seeking prospective relief is not treated as an action against the State."  *Burns v. Alexander*, 776 F. Supp. 2d 57, 73 (W.D. Pa. 2011).  Ickes does not specify the form of relief that he is seeking.  (ECF No. 1-2 at 5).  Since all of his claims are based on past conduct, however, it appears that he does not have standing to seek an injunction against any of the Defendants named in his complaint.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–13 (1983).

Ickes alleges that the Defendants conspired to violate his "freedom of speech." (ECF No. 1-2 ¶ 34). Speech otherwise enjoying constitutional protection under the First Amendment may not be proscribed merely because it is uttered in the presence of a police officer performing his or her official duties. *Hess v. Indiana*, 414 U.S. 105, 107–09 (1973) (per curiam). It is not clear whether an individual engaging in expressive activities can assert a First Amendment retaliation claim based on a discretionary arrest that is supported by probable cause. *Reichle v. Howards*, 132 S. Ct. 2088, 2093–97 (2012); *George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013). The Court need not confront that issue in this case, since Ickes does not allege that he uttered "speech" protected under the First Amendment. (ECF No. 1-2 ¶¶ 9–18, 34). To the extent that Ickes alleges that the Defendants violated his "freedom of speech," his complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Defendants' motions to dismiss will be granted with respect to all claims arising under the First Amendment.

## C. The "Right to Travel" Claims

Article IV of the Articles of Confederation provided that "the people of each State shall have free ingress and regress to and from any other State." *Slaughter-House Cases*, 83 U.S. 36, 75 (1873). A principal objective of the Constitution was to "form a more perfect Union" than the one which had existed under the Articles. U.S. Const., Pmbl. Although the right to travel "finds no explicit mention in the Constitution," it "was conceived from the beginning to be a necessary concomitant of the stronger Union" that the Constitution was designed to create. *United States v. Guest*, 383 U.S. 745, 758 (1966). Ickes, who

describes himself as "a Florida resident with occasional family and business interests in Pennsylvania," alleges that the Defendants violated his "right to travel." (ECF No. 1-2 ¶¶ 1, 34).

Because the right to travel from one State to another "does not necessarily rest on the Fourteenth Amendment," it is "assertable against private as well as governmental interference." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). To proceed under § 1983, however, Ickes must independently allege that the Defendants acted under color of Pennsylvania law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982). This statutory prerequisite to liability requires an invocation of state authority. *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179, 191 (1988). That requirement is easily satisfied in this case, since Ickes' claims against the Defendants all arise out of an arrest made by police officers charged with the duty of enforcing Pennsylvania law. (ECF No. 1-2 ¶¶ 9–18).

The constitutional freedom of interstate travel is "virtually unqualified." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *Califano v. Torres*, 435 U.S. 1, 4 n.6 (1978) (per curiam). Nonetheless, the constitutional right to travel is not implicated every time an adverse action is taken against someone who happens to be an interstate traveler. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276–77 (1993). The only burden on Ickes' right to travel apparent from the complaint was his inability to move about freely during the alleged period of detention. (ECF No. 1-2 ¶¶ 14–15). An arrest supported by probable cause does not violate the arrestee's right to travel merely because it has the incidental

effect of preventing him or her from leaving the State in which he or she is detained. *Jones v. Helms*, 452 U.S. 412, 419 (1981).

If Ickes is a United States citizen, his residency[11] in Florida renders him a citizen of that State. U.S. Const., Amend. XIV, § 1; *Hicklin v. Orbeck*, 437 U.S. 518, 524 n.8 (1978); *Austin v. New Hampshire*, 420 U.S. 656, 662 n.8 (1975). The Privileges and Immunities Clause of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., Art. IV, § 2. This constitutional provision proscribes certain actions taken by a State "for the protectionist purpose of burdening out-of-state citizens." *McBurney v. Young*, 133 S. Ct. 1709, 1715 (2013). It requires a State to "accord residents and nonresidents equal treatment" with respect to certain "'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 279 (1985); *Baldwin v. Fish & Game Commission of Montana*, 436 U.S. 371, 383 (1978). Ickes does not allege that he was targeted for arrest because of his Florida citizenship. (ECF No. 1-2 ¶¶ 1, 9–18). Nothing in the complaint suggests that he was treated less favorably than a citizen of Pennsylvania would have been treated under similar circumstances. (*Id.*).

The Privileges or Immunities Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const., Amend. XIV, § 1. This provision has been construed to guarantee the right of a United States citizen to "become a citizen of any

---

[11] For purposes of citizenship, the Court understands an individual's State of "residency" to be the same as his or her State of "domicile." *Saenz v. Roe*, 526 U.S. 489, 505 (1999).

State of the Union by a bona fide residence therein, with the same rights as other citizens of that State." *Slaughter-House Cases*, 83 U.S. at 80. The Privileges or Immunities Clause prohibits a State from discriminating against classes of its own citizens based on their length of residence. *Saenz v. Roe*, 526 U.S. 489, 502–11 (1999). Ickes does not allege that he elected to become a resident of Pennsylvania, or that the decision to arrest him was somehow based on the duration of his presence within the Commonwealth. (ECF No. 1-2 ¶¶ 1, 9–18). Since the allegations in the complaint do not implicate any relevant component of the constitutional "right to travel," the Defendants' motions to dismiss will be granted with respect to Ickes' claims based on alleged violations of that right.

### D. The Fourth Amendment Claims

The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV. The prohibitions found in the Fourth Amendment are incorporated within the Due Process Clause of the Fourteenth Amendment. *Cady v. Dombrowski*, 413 U.S. 433, 440 (1973). The rights secured to individuals under the Fourth Amendment are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy v. Hogan*, 378 U.S. 1, 10 (1964).

Ickes alleges that the Defendants conspired to interfere with his "freedom from unreasonable seizure[s]." (ECF No. 1-2 ¶ 34). The Court interprets Ickes' "unreasonable

seizure" claims to be based on the Fourth Amendment. A "seizure" occurs when the government terminates an individual's freedom of movement "through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis deleted). Ickes alleges that Laskey "stopped" his Ford Escort on Interstate 99 after observing "alleged traffic infractions." (ECF No. 1-2 ¶ 9). A traffic stop of the kind alleged by Ickes constitutes a "seizure" within the meaning of the Fourth Amendment. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Ickes was obviously "seized" when he was placed under arrest. *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306, 315 (W.D. Pa. 2011). The constitutionality of the seizures alleged by Ickes depends on whether they were "reasonable." *Thompson v. Wagner*, 631 F. Supp. 2d 664, 672 (W.D. Pa. 2008).

"A warrantless arrest of an individual in a public place for a felony, or [for] a misdemeanor committed in the [arresting] officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). For an arrest to be lawful, "[p]robable cause need only exist as to any offense that could be charged under the circumstances." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).

It is undisputed that Ickes was convicted of resisting arrest, harassment, and several violations of the Vehicle Code. (ECF No. 7-2 at 2–8). Relying on those convictions, the Defendants argue that Ickes' Fourth Amendment claims must be dismissed pursuant

to the rule announced in *Heck v. Humphrey*, 512 U.S. 477 (1994).  Speaking through Justice

Scalia in *Heck*, the Supreme Court declared:

> We hold that, in order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions whose
> unlawfulness would render a conviction or sentence invalid, a § 1983
> plaintiff must prove that the conviction or sentence has been reversed on
> direct appeal, expunged by executive order, declared invalid by a state
> tribunal authorized to make such determination, or called into question by
> a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A
> claim for damages bearing that relationship to a conviction or sentence that
> has *not* been so invalidated is not cognizable under § 1983.  Thus, when a
> state prisoner seeks damages in a § 1983 suit, the district court must
> consider whether a judgment in favor of the plaintiff would necessarily
> imply the invalidity of his conviction or sentence; if it would, the complaint
> must be dismissed unless the plaintiff can demonstrate that the conviction
> or sentence has already been invalidated.  But if the district court
> determines that the plaintiff's action, even if successful, will *not*
> demonstrate the invalidity of any outstanding criminal judgment against
> the plaintiff, the action should be allowed to proceed, in the absence of
> some other bar to the suit.

*Heck*, 512 U.S. at 486–87 (footnotes omitted and emphasis in original).  The Defendants

maintain that any judgment rendered in Ickes' favor would necessarily imply the

invalidity of his criminal convictions.  (ECF No. 8 at 8–11; ECF No. 10 at 6–7).

Since "outstanding criminal judgments" have been entered against Ickes, the

principles discussed in *Heck* apply in this case.  *Wallace v. Kato*, 549 U.S. 384, 392–94 (2007).

Those principles, however, do not sweep as broadly as the Defendants suggest.  The

application of *Heck* requires careful consideration of the relationship between a specific §

1983 claim and the underlying conviction or sentence.  *Wilkinson v. Dotson*, 544 U.S. 74, 80–

84 (2005).  *Heck* requires the dismissal only of the particular claims that, if successful,

would *necessarily* imply the invalidity of Ickes' convictions. *Skinner v. Switzer*, 131 S. Ct. 1289, 1298–99 (2011).

In his complaint, Ickes alleges that Laskey stopped the Ford Escort because of "alleged traffic infractions." (ECF No. 1-2 ¶ 9). Ickes was ultimately convicted of several offenses under the Vehicle Code. (ECF No. 7-2 at 3–8). At least some of Ickes' violations would have been apparent to Laskey *before* he decided to stop the vehicle. For example, Ickes was convicted of failing to yield to an emergency vehicle[12] and exceeding the speed limit.[13] (*Id.* at 7). Regardless of how minor Ickes' traffic violations may have seemed, they provided Laskey with a constitutionally permissible basis for stopping the Ford Escort.[14] *Whren v. United States*, 517 U.S. 806, 816–19 (1996). A determination that Laskey did not have probable cause to stop Ickes' vehicle would necessarily imply the invalidity of his convictions. *Cole v. Doe*, 387 F. Supp. 2d 1084, 1090 (N.D. Ca. 2005).

Pennsylvania's statute defining the offense of "resisting arrest" provides:

> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a *lawful* arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

---

[12] 18 Pa. Cons. Stat. § 3325(a).

[13] 18 Pa. Cons. Stat. § 3362(a).

[14] The traffic stop was constitutionally permissible even if it was not in conformity with Pennsylvania law. *Virginia v. Moore*, 553 U.S. 164, 168–76 (2008). Since the Fourth Amendment does not incorporate statutory limitations that a State may place on the ability of a police officer to effect a seizure, the Court need not speculate as to whether Laskey's conduct was consistent with standards existing apart from the Constitution. *Kokinda v. Breiner*, 557 F. Supp. 2d 581, 592–93 (M.D. Pa. 2008).

18 Pa. Cons. Stat. § 5104 (emphasis added). Because this statutory provision unambiguously prohibits certain actions taken to prevent a public servant from making a "lawful arrest," the Pennsylvania Supreme Court has held that "the underlying arrest must be lawful" in order for an individual to commit the crime of "resisting arrest." *Commonwealth v. Jackson*, 924 A.2d 618, 236–37 (Pa. 2007). Ickes was convicted of that crime.[15] (ECF No. 7-2 at 2). In order to establish that the arresting officers subjected him to an "unreasonable seizure" by placing him under arrest, Ickes "would have to negate an element of the offense of which he has been convicted." *Heck*, 512 U.S. at 486 n.6.

The Third Circuit has held that the application of *Heck* does not depend on whether a plaintiff bringing a claim under § 1983 is still in custody. *Williams v. Consovoy*, 453 F.3d 173, 177–78 (3d Cir. 2006). Ickes cannot invoke § 1983 to collaterally attack his convictions. *Sharif v. Picone*, 740 F.3d 263, 269 (3d Cir. 2014). His Fourth Amendment claims will be dismissed to the extent that they are premised on an assertion that the individual defendants did not have a constitutionally "reasonable" basis for stopping his vehicle or placing him under arrest.

The "reasonableness" of a seizure depends not only on whether it is constitutionally justified, but also on "how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). A police officer violates the Fourth Amendment when he or she uses "excessive force" to effect an otherwise lawful seizure. *Plumhoff v. Rickard*, 188 L.Ed.2d

---

[15] Since Ickes' harassment convictions appear to be premised on conduct occurring *after* his arrest, they have no bearing on whether his Fourth Amendment claims are barred by the rule established in *Heck v. Humphrey*, 512 U.S. 477 (1994). *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306, 316–17 (W.D. Pa. 2011).

1056, 1066 (2014). Since a *lawful* arrest can sometimes be carried out in an *unlawful* manner, an individual convicted of resisting arrest under Pennsylvania law is not foreclosed from bringing an "excessive force" claim under § 1983. *Nelson v. Jashurek*, 109 F.3d 142, 145–46 (3d Cir. 1997). The averments in Ickes' complaint suggest that some of his Fourth Amendment claims are based on the idea that the arresting officers used an "unreasonable" amount of force while taking him into custody. (ECF No. 1-2 ¶¶ 12–15). To the extent that Ickes' Fourth Amendment claims are grounded in a theory of "excessive force," they are not barred by *Heck*. *Lora-Pena v. Federal Bureau of Investigation*, 529 F.3d 503, 506 (3d Cir. 2008).

When a judgment is rendered by a state court, federal courts are required to accord that judgment preclusive effect under 28 U.S.C. § 1738, which provides that "[t]he records and judicial proceedings of any court of any . . . State, Territory or Possession . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."[16] *PG Publishing Co. v. Aichele*, 902 F. Supp. 2d 724, 742 (W.D. Pa. 2012). "Th[at] statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 336 (2005). "Claim preclusion generally refers to the effect of a prior judgment in foreclosing

---

[16] The Full Faith and Credit Clause of the United States Constitution requires the courts of one State to give preclusive effect to the judgments rendered by the courts of another State. U.S. Const., Art. IV, § 1; *Riley v. New York Trust Co.*, 315 U.S. 343, 348–49 (1942). Federal courts are not *constitutionally* required to give preclusive effect to judgments issued by state courts. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 483 n.24 (1982) (observing that federal courts are "not included within the constitutional provision").

successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.  Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim."  *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001).  A federal court must give a judgment rendered by a state court the same preclusive effect that it would be accorded in the courts of the relevant State. *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986).  Congress has the authority to carve exceptions into § 1738's legislative mandate.  *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 386 (1985).  In enacting § 1983, however, Congress did not "repeal or restrict the traditional doctrines of preclusion" otherwise applicable under § 1738.  *Allen v. McCurry*, 449 U.S. 90, 98 (1980).

The Defendants argue that Ickes is collaterally estopped from proceeding with his Fourth Amendment claims.  (ECF No. 8 at 11–12; ECF No. 10 at 7).  The Court must look to Pennsylvania law to determine whether those claims are precluded by Ickes' criminal convictions.  *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81–87 (1984).  When Ickes was convicted of resisting arrest, it was conclusively determined that his arrest had been lawful.  *Commonwealth v. Biagini*, 655 A.2d 492, 497 (Pa. 1995).  The mere fact that the arrest was legally justified does not foreclose the possibility that excessive force was used to subdue Ickes.  *Commonwealth v. French*, 611 A.2d 175, 177–79 (Pa. 1992).  Consequently, Ickes is not precluded from proceeding with his Fourth Amendment claims based on a theory of excessive force.  *Lora-Pena*, 529 F.3d at 506.

Ickes alleges that he was "dragged out of" his Ford Escort, pulled "over broken glass," and placed on a "gravel road." (ECF No. 1-2 ¶ 14). He claims that his "hands were tightly cuffed behind his back, causing his wrists to bleed." (*Id.* ¶ 15). Ickes accuses the arresting officers of employing "roughhouse tactics" during the encounter. (*Id.*). Describing himself as a "disabled elderly motorist," Ickes avers that he was subjected to "harmful and offensive conduct." (*Id.* ¶ 20). He further asserts that "statements" made by the four police officers suggested that they had conspired to "assault" and "batter" him. (*Id.* ¶ 30).

"In determining the reasonableness of the manner in which a seizure is effected, '[a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotation omitted). The "proper application" of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In this case, the relevant question is whether the force used by the arresting officers to take Ickes into custody was objectively reasonable in light of the information available to them at the time of the arrest. *Saucier v. Katz*, 533 U.S. 194, 206–07 (2001). The Third Circuit has held that, under certain circumstances, the use of "excessively tight" handcuffs can violate an arrestee's Fourth Amendment rights. *Kopec v. Tate*, 361 F.3d 772, 777–78 (3d Cir. 2004). When viewed in the light most favorable to Ickes,

the complaint states Fourth Amendment claims upon which relief could be granted. The pending motions to dismiss will be denied with respect to any Fourth Amendment claims brought against the personal-capacity Defendants based on allegations that excessive force was used to arrest Ickes.

For reasons that are not entirely clear, the individual Defendants do not move for dismissal of any federal claims based on qualified immunity.[17] (ECF Nos. 7–10). Qualified immunity is an affirmative defense. *Crawford-El v. Britton*, 523 U.S. 574, 886–87 (1998). Ickes was not required to anticipate that such a defense would be raised and tailor his pleadings accordingly. *Gomez v. Toledo*, 446 U.S. 635, 639–41 (1980). Since the defense has not been raised, the Court has no occasion to consider whether any of the individual Defendants in this action would otherwise be entitled to qualified immunity at this stage. *Behrens v. Pelletier*, 516 U.S. 299, 306–09 (1996) (discussing the ability of a defendant to raise the affirmative defense of qualified immunity at different stages of a case).

Nevertheless, it is worth noting that Ickes allegedly "declined to exit" his vehicle because he was "distrustful and fearful of Laskey." (ECF No. 1-2 ¶ 10). The United States Supreme Court has held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers [at the scene] may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam). That rule

---

[17] The Township parties briefly mentioned the individual Defendants' potential entitlement to qualified immunity in a brief opposing Ickes' earlier motion to stay this action. (ECF No. 13 at 3). In their motions and briefs requesting the dismissal of Ickes' federal claims, however, none of the individual Defendants raise the defense of qualified immunity.

reflects the dangers faced by police officers during the course of routine traffic stops. *Maryland v. Wilson*, 519 U.S. 408, 412–15 (1997). It is not clear from the complaint whether Ickes specifically disobeyed a verbal command to exit the Ford Escort, or whether he was only asked to provide Laskey with the appropriate documentation. (ECF No. 1-2 ¶ 10). The degree of force that may be constitutionally employed against an arrestee "depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam). At this juncture, the ambiguous factual allegations contained in the complaint must be construed in the light most favorable to Ickes. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). In order to state an actionable claim against a particular defendant, Ickes was not required to "set forth allegations negating an affirmative defense." *Thomas v. Independence Township*, 463 F.3d 285, 293 (3d Cir. 2006). No opinion is expressed as to whether Ickes will ultimately be successful in establishing violations of his Fourth Amendment right to be free from "excessive force," or as to whether the contours of that right were "sufficiently clear" that a "reasonable official" in the position of the individual Defendants would have understood the degree of force used in this particular instance to be unconstitutional. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court holds only that the allegations in the complaint, when read in the light most favorable to Ickes, allege that the arresting officers employed a constitutionally "unreasonable" degree of force while taking him into custody. (ECF No. 1-2 ¶¶ 10–15, 20, 30).

E.      **The Due Process Claims**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amend. XIV, § 1.  Although the text of the Due Process Clause refers only to the "process" through which a person is deprived of a constitutionally-protected liberty or property interest, the Supreme Court has declared that the constitutional provision "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). The Due Process Clause has been construed to prohibit "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986).  "In this respect, the Fourteenth Amendment *substantively* prohibits a State from 'abusing governmental power' or 'employing it as an instrument of oppression.'" *Douglas*, 836 F. Supp. 2d at 350 (emphasis in original) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)).  "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987).  The essential requirements of *procedural* "due process" are "notice and an opportunity to respond." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985).  The "due process" required under the Fourteenth Amendment "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Ickes generally avers that the Defendants violated his "right to due process." (ECF No. 1-2 ¶ 34).  He also accuses them of violating his "substantive due process" right to

23

"bodily integrity." (*Id.*). The Court understands his substantive due process claims to be based on the same factual allegations as his excessive force claims under the Fourth Amendment.

In *Rochin v. California*, 342 U.S. 165, 166 (1952), the Supreme Court held that the Due Process Clause prohibited police officers from directing medical personnel to "pump" a suspect's stomach with a tube and an emetic solution in order to induce vomiting for the purpose of producing illegal capsules of morphine that the officers had seen the suspect swallow. The Supreme Court set aside the conviction of the suspect, who had been convicted of illegally possessing the capsules. *Rochin*, 342 U.S. at 166, 174. Speaking through Justice Frankfurter, the Supreme Court explained:

> [W]e are compelled to conclude that the proceedings by which this conviction was obtained do more than offend fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

*Id.* at 172. Because the force used to procure the relevant incriminating evidence had been "offensive to human dignity," it was deemed to be proscribed by the Fourteenth Amendment. *Id.* at 174. The holding in *Rochin* has been cited as a basis for recognizing a substantive due process right to "bodily integrity." *Glucksberg*, 521 U.S. at 720.

When *Rochin* was decided, the Fourteenth Amendment was not understood to forbid the admission of evidence procured by means of an unreasonable search or seizure in a state prosecution. *Wolf v. Colorado*, 338 U.S. 25, 33 (1949). The Supreme Court

reversed course in *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), declaring evidence obtained in violation of the Fourth Amendment, which was "enforceable against the States through the Due Process Clause" of the Fourteenth Amendment, to be "inadmissible in a state court."[18]  The Supreme Court later held, in *Winston v. Lee*, 470 U.S. 753, 755, 766–67 (1985), that the Fourth Amendment prohibited a State from forcing a suspect to undergo an invasive surgical procedure designed to uncover incriminating evidence lodged inside of his body.  *Winston* was followed by *Tennessee v. Garner*, 471 U.S. 1, 8 (1985), in which the Supreme Court explicitly clarified that the "reasonableness" of a seizure depended not only on *when* or *why* it was effectuated, but also on *how* it was carried out.   In the aftermath of *Mapp*, *Winston*, and *Garner*, courts began to recognize that claims grounded in the right vindicated in *Rochin* were to be analyzed under the Fourth Amendment's standard of "reasonableness" rather than under a less precise "substantive due process" standard.  *Lester v. City of Chicago*, 830 F.2d 706, 710–12 (7th Cir. 1987).  This approach was expressly adopted by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 395 (1989).

In *County of Sacramento v. Lewis*, 523 U.S. 833, 849 n.9 (1998), the Supreme Court recognized that *Graham* had reclassified the particular right vindicated in *Rochin* as a right secured by the Fourth Amendment.[19]  Under *Graham*, police officers violate the Fourth Amendment when they effect a "seizure" through the use of "excessive force."  *Graham*,

[18] In more recent decisions, the Supreme Court has concluded that evidence seized in violation of the Fourth and Fourteenth Amendments can sometimes be admitted into evidence notwithstanding the unconstitutional manner of its procurement.  *Hudson v. Michigan*, 547 U.S. 586, 591–602 (2006); *Arizona v. Evans*, 514 U.S. 1, 10–16 (1995).

[19] The Supreme Court recently described the "bodily invasion" at issue in *Rochin v. California*, 342 U.S. 165 (1952), as having been "unreasonable."  *Missouri v. McNeely*, 133 S.Ct. 1552, 1565 (2013).

490 U.S. at 395. Because the plain text of the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures," the contours of that right are not defined by "the more generalized notion of 'substantive due process.'" U.S. Const., Amend. IV; *Graham*, 490 U.S. at 395. The rule announced in *Graham*, which characterizes constitutionally-based "excessive force" claims as claims arising under the Fourth Amendment, is based on the understanding that the provisions found in the Bill of Rights were specifically designed "to restrict the exercise of arbitrary authority by the Government in particular situations." *Albright v. Oliver*, 510 U.S. 266, 273 (1994).

In "substantive due process" cases falling outside of the Fourth Amendment's purview, *Rochin* continues to define "the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 U.S. at 846–47. The Due Process Clause prohibits state officials from using their power to violate an individual's "bodily integrity" in a conscience-shocking manner. *Stoneking v. Bradford Area School District*, 882 F.2d 720, 727 (3d Cir. 1989). The constitutional right to "bodily integrity" is violated when state power is used to facilitate a sexual assault, or to cause injuries bearing no relationship to the enforcement of the law. *United States v. Lanier*, 520 U.S. 259, 262 (1997).

Although Ickes alleges that the arresting officers conspired to "assault" and "batter" him, he does not describe any acts of physical abuse extending beyond the arrest itself. (ECF No. 1-2 ¶¶ 12–15, 20, 30). Since the arresting officers completed the arrest, Ickes was clearly "seized" within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 254 (2007). He does not complain of injuries sustained during a

flight from an *attempted* seizure. *Lewis*, 523 U.S. at 843–45 (explaining that a claim was not "covered by" the Fourth Amendment because it was based on injuries suffered by an individual who had been killed in an accident during a flight from approaching police officers). Given that Ickes' claims of physical abuse are all based on the level of force employed to effectuate his arrest, they cannot proceed on a theory of "substantive due process." *Graham*, 490 U.S. at 395. Instead, they must be analyzed "solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person." *Id.* The § 1983 claims based on alleged violations of Ickes' "substantive due process" right to "bodily integrity" will be dismissed.

Ickes alleges that, at the time of his arrest, he was "permanently deprived" of "groceries and medicines" found within his vehicle. (*Id.* ¶ 24). It is not clear whether this allegation forms the basis of his generalized "due process" claim. (*Id.* ¶ 34). In any event, the complaint does not contain factual allegations suggesting that Ickes was deprived of property "without due process of law." U.S. Const., Amend. XIV, § 1.

The Due Process Clause "raises no impenetrable barrier to the taking of a person's possessions." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). "Instead, it merely requires that state-occasioned deprivations of liberty and property interests be effectuated in accordance with 'due process of law.'" *Whittaker v. County of Lawrence*, 674 F. Supp. 2d 668, 693 (W.D. Pa. 2009). Under Pennsylvania Rule of Criminal Procedure 588(A), "[a] person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of [his or her] property on the ground that he or she is entitled to lawful possession thereof." Pa. R. Crim. P. 588(A). The existence of this remedy provides

an aggrieved individual with the "due process" to which he or she is constitutionally entitled. *Kauffman v. Pennsylvania Society for the Prevention of Cruelty to Animals*, 766 F. Supp. 2d 555, 571 (E.D. Pa. 2011). Because Rule 588(A) is generally available and may be accessed by anyone, the Defendants were not *constitutionally* required to inform Ickes of its existence. *City of West Covina v. Perkins*, 525 U.S. 234, 240–41 (1999); *Revell v. Port Authority of New York & New Jersey*, 598 F.3d 128, 138–39 (3d Cir. 2010).

Ickes accuses the arresting officers of assaults, batteries, and trespasses that could reasonably be characterized as "deprivations" of constitutionally protected liberty and property interests. (ECF No. 1-2 ¶¶ 19-22). Where a deprivation is caused by an unauthorized act of a state official rather than through the invocation of an established state procedure, a State satisfies its constitutional obligations under the Due Process Clause by providing the aggrieved individual with an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Since random and unauthorized conduct is difficult to predict or control, it is virtually impossible for a State to provide pre-deprivation process in that situation. *Zinermon v. Burch*, 494 U.S. 113, 137 (1990). If an adequate post-deprivation remedy is available to the complaining party, he or she has not been deprived of liberty or property without due process of law. *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627, 642–43 (1999). Ickes does not aver that the tort remedies available under Pennsylvania law are insufficient to redress the injuries to his liberty and property caused by the allegedly unlawful assaults, batteries, and trespasses perpetrated by the arresting officers. (ECF No. 1-2 ¶¶ 19–34). Thus, he does not state actionable claims for violations of procedural

due process. *Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981).[20] The Defendants' motions to dismiss will be granted with respect to Ickes' "due process" claims.

**F.      The Constitutional Claims Asserted Against the Township**

Local governments cannot avail themselves of the Eleventh Amendment immunity enjoyed by the States. *Board of Trustees v. Garrett*, 531 U.S. 356, 369 (2001); *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890). In *Monell v. Dept. of Social Services*, 436 U.S. 658, 690–91 (1978), the Supreme Court held that municipal entities were "persons" subject to suit under § 1983. Nonetheless, a local government cannot be held vicariously liable under § 1983 for constitutional violations committed by its agents or employees. *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000).

A plaintiff may recover damages from a municipal entity only when his or her federal rights are violated by the execution of that entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. A municipal governing body is liable for constitutional injuries inflicted by the implementation of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability

---

[20] Although *Parratt v. Taylor*, 451 U.S. 527 (1981), was overruled by *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986), to the extent it had treated an unintended loss of property attributable to the negligence of a state official as a "deprivation" of property within the meaning of the Due Process Clause, it remains good law insofar as it held that a post-deprivation tort remedy constitutes the "due process" required under the Fourteenth Amendment when the "deprivation" at issue is caused by the "random" or "unauthorized" actions of a state official. *Burns v. Alexander*, 776 F.Supp.2d 57, 90 n.30 (W.D. Pa. 2011).

on the theory that the relevant practice is so widespread as to have the force of law." *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997). Where a plaintiff alleges that a municipal "policy or custom" has led a municipal employee to violate a federal right, "stringent standards of culpability and causation" must be applied to ensure that the municipality is not held liable solely because it happens to employ the individual responsible for the violation at issue. *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

To hold the Township liable under § 1983, Ickes must demonstrate that the Township *itself* violated his constitutional rights or "caused" him "to be subjected" to such a violation. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Municipal liability under *Monell* must be directly tied to the "constitutional injury" suffered by a plaintiff. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). For the reasons discussed above, the only federal claims remaining in this case are the Fourth Amendment claims based on the alleged use of excessive force in connection with Ickes' arrest. Ickes alleges that "the Greenfield policeman"[21] helped to hold him down on the gravel while he was subjected to "harmful and offensive conduct" at the hands of other officers. (ECF No. 1-2 ¶ 20). That is the only averment in the complaint specifically describing misconduct allegedly engaged in by Givler. Although Givler was the Township's Chief of Police, his momentary response to Ickes' conduct at the scene of the arrest cannot reasonably be attributed to the Township. *Pembaur v. City of*

---

[21] The Court interprets Ickes' use of the phrase "the Greenfield policeman" to be a reference to Givler. (ECF No. 1-2 ¶¶ 6, 11, 20, 32).

*Cincinnati*, 475 U.S. 469, 481–82 (1986) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official policy for purposes of § 1983." *Connick*, 131 S. Ct. at 1359. Ickes alleges that the "police misconduct" at issue in this case was "caused and aggravated" by Givler's failure to "adequately train, supervise and discipline" his subordinates. (ECF No. 1-2 ¶ 32). The Supreme Court has held that such an "inadequacy of police training" may serve as a basis for liability under § 1983 only where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388. The complaint does not contain allegations suggesting that the Township was deliberately indifferent to the rights of its inhabitants or guests. (ECF No. 1-2 ¶ 32). Even where deliberate indifference can be established, "a plaintiff must also demonstrate that the inadequate training caused a constitutional violation." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). Givler is the *only* member of the Township's police force alleged to have been present at the time of Ickes' arrest. (ECF No. 1-2 ¶ 6). It is difficult to fathom how Ickes' injuries could have been caused by Givler's failure to properly train Township police officers who played no role in the allegedly unconstitutional seizure. For these reasons, the federal claims asserted against the Township will be dismissed. To the extent that Ickes is attempting to assert Fourth Amendment claims against Givler in his official capacity, those claims will be dismissed on the ground that they are indistinguishable

from the claims brought against the Township. *McMillan v. Monroe County*, 520 U.S. 781, 785 n.2 (1997).

### G. The Constitutional Claims Asserted Against Givler and Grassmeyer

A government official sued under § 1983 may be held liable only for his or her own misconduct. *Iqbal*, 556 U.S. at 677. In this context, a supervisor cannot be held liable for the conduct of subordinates under a theory of *respondeat superior*. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). A supervisor is subject to liability under § 1983 only when he or she is personally involved in the constitutional or statutory violation giving rise to the plaintiff's claim. *Mitchell v. Miller*, 884 F. Supp. 2d 334, 358–59 (W.D. Pa. 2012). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Ickes alleges that both Givler and Grassmeyer were entrusted with "special responsibility over their subordinates," and that they "failed to adequately train, supervise and discipline their respective men." (ECF No. 1-2 ¶ 32). A supervisor's mere awareness of constitutional or statutory violations committed by his or her subordinates cannot serve as a predicate for liability under § 1983. *Iqbal*, 556 U.S. at 677. In this case, however, Ickes alleges that Givler and Grassmeyer were physically present at the scene of his arrest. (ECF No. 1-2 ¶¶ 11-12). According to the complaint, Grassmeyer "order[ed] that Ickes be forcibly removed from his vehicle." (*Id.* ¶ 12). Ickes claims that he was held down on a gravel road by "the Greenfield policeman" while the Troopers were engaging in "harmful and offensive conduct." (*Id.* ¶ 20). Givler is the only "Greenfield policeman"

alleged to have been present at the time of Ickes' arrest.  (*Id.* ¶¶ 6, 11).  Since Ickes avers

that Grassmeyer and Givler engaged in specific conduct at a particular time and place, the

complaint adequately alleges that those two Defendants were personally involved in

perpetrating the relevant Fourth Amendment violations.   *Evancho*, 423 F.3d at 353;

*Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 473 (W.D. Pa. 2007).

### H.      The False Imprisonment Claims

Ickes asserts claims against the Defendants for false imprisonment.  He alleges that

all four police officers named in the complaint "needlessly detained" and "restrained"

him, thereby "hindering his efforts to peaceably travel elsewhere" and "depriving him of

his liberty by physical compulsion."  (ECF No. 1-2 ¶ 26).  To hold the Defendants liable for

false imprisonment, Ickes must establish that he was unlawfully detained.  *Gwynn v. City*

*of Philadelphia*, 719 F.3d 295, 304 n.4 (3d Cir. 2013).  Under Pennsylvania law, an individual

can commit the offense of resisting arrest only if the arrest in question is lawful.

*Commonwealth v. Karl*, 476 A.2d 908, 911 (Pa. Super. Ct. 1984).  It is undisputed that Ickes

was convicted of resisting arrest.  (ECF No. 7-2 at 2).  That conviction was premised on a

determination that he had been lawfully arrested.  *Biagini*, 655 A.2d at 497.  Since that

issue has already been resolved against Ickes, he is collaterally estopped from relitigating

the lawfulness of the arrest in this action.  *Shaffer v. Smith*, 673 A.2d 872, 874–75 (Pa. 1996).

The Court will thus dismiss Ickes' false imprisonment claims.

# I.        The Assault and Battery Claims

Under Pennsylvania law, an individual commits a battery when he or she intentionally causes a harmful or offensive contact with another person's body. *Cooper v. Lankenau Hospital*, 51 A.3d 183, 191–92 (Pa. 2012). An individual commits assault when he or she acts to cause an actual battery or to place another person in "imminent apprehension" of a battery, thereby causing the person to be "put in such imminent apprehension." *Jackson v. Pennsylvania Board of Probation & Parole*, 885 A.2d 598, 601 n.2 (Pa. Commw. Ct. 2005) (quoting the *Restatement (Second) of Torts* § 21 (1965)). Ickes alleges that the three members of the PSP—especially Laskey and Grassmeyer—inflicted "harmful and offensive conduct" on him while he was held down by "the Greenfield policeman." (ECF No. 1-2 ¶ 20). Ickes also avers that the arresting officers made "statements" indicating that they had "agreed to assault [and] batter him." (*Id.* ¶ 30).

The Commonwealth parties move for the dismissal of the assault and battery claims asserted against them on the ground that those claims are barred by Pennsylvania's Sovereign Immunity Act, 42 Pa. Cons. Stat. § 8521 *et seq.* (ECF No. 8 at 5-7). In a similar vein, the Township parties maintain that Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat. § 8541 *et seq.*, shields them from Ickes' assault and battery claims. (ECF No. 10 at 3-4). Because of certain differences between the two statutes, these arguments will be addressed separately.[22]

_____

[22] It is axiomatic that the immunities available to the Defendants under Pennsylvania law do not shield them from liability for federal constitutional and statutory violations actionable under § 1983. *Haywood v. Drown*, 556 U.S. 729, 736 n.5 (2009); *Howlett v. Rose*, 496 U.S. 356, 375-377 (1990). The Sovereign Immunity Act and the PSTCA are relevant only to the claims

Article I, Section 11 of the Pennsylvania Constitution provides, in pertinent part, that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."  Pa. Const., Art. I, § 11.  This constitutional provision provides Pennsylvania's General Assembly with the power to specify the types of civil actions that may be maintained against the Commonwealth. *Lingo v. Philadelphia Housing Authority*, 820 A.2d 859, 861 (Pa. Commw. Ct. 2003).  Pursuant to that authority, the General Assembly has enacted 1 Pa. Cons. Stat. § 2310:

> **§ 2310.  Sovereign immunity reaffirmed; specific waiver**
> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, *and its officials and employees acting within the scope of their duties*, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.  When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth *and its officials and employees* shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 Pa. Cons. Stat. § 2310 (emphasis added).  Except where a more specific statutory provision provides to the contrary, § 2310 shields Commonwealth officials and employees from civil liability for torts committed "within the scope of their duties."  *Story v. Mechling*, 412 F. Supp. 2d 509, 518–19 (W.D. Pa. 2006).

The applicable language of the Sovereign Immunity Act states that, except as otherwise provided therein, no statutory provision "shall constitute a waiver of sovereign

---

arising under Pennsylvania law.  *Brown v. Tucci*, 960 F. Supp. 2d 544, 586 n.19 (W.D. Pa. 2013) (remarking that federal constitutional claims brought under § 1983 "are not subject to immunity defenses existing under Pennsylvania law").

immunity." 42 Pa. Cons. Stat. § 8521(a). The provision waiving sovereign immunity in certain instances is codified at 42 Pa. Cons. Stat. § 8522(a), which provides:

> **§ 8522. Exceptions to sovereign immunity**
> **(a) Liability imposed.**—The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a *negligent act* where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

42 Pa. Cons. Stat. § 8522(a) (emphasis added). The term "Commonwealth party" is defined as "[a] Commonwealth agency and any employee thereof, but *only with respect to an act within the scope of his office or employment*." *Id.* § 8501 (emphasis added).

The Sovereign Immunity Act immunizes Commonwealth parties from liability for intentional torts. *Holt v. Northwest Pennsylvania Training Partnership Consortium, Inc.*, 694 A.2d 1134, 1140 (Pa. Commw. Ct. 1997). Assault and battery are regarded as intentional torts under Pennsylvania law. *Gene's Restaurant, Inc. v. Nationwide Insurance Co.*, 548 A.2d 246, 247 n.2 (Pa. 1988). Since the Sovereign Immunity Act waives the sovereign immunity of a Commonwealth party only "for damages arising out of a negligent act," a claim must sound in negligence to be actionable against such a party. *Balshy v. Pennsylvania State Police*, 988 A.2d 813, 828 (Pa. Commw. Ct. 2012). A claim based on an assault or a battery cannot proceed under a theory of negligence. *Aetna Casualty & Surety Co. v. Roe*, 650 A.2d 94, 103 (Pa. Super. Ct. 1994) ("[N]o precedent exists for recovery in negligence for injuries suffered as a result of the commission by a tortfeasor of the intentional torts of assault and

battery."). Because Pennsylvania's waiver of sovereign immunity clearly does not embrace the assault and battery claims asserted by Ickes in this case, the Court has no occasion to consider whether those claims would otherwise fall within "the instances set forth in subsection (b)."[23] 42 Pa. Cons. Stat. § 8522(a). The assault and battery claims brought against the Commonwealth are clearly barred. The viability of the assault and battery claims brought against Laskey, Augnst, and Grassmeyer depends entirely on whether those defendants qualified as "Commonwealth parties" for statutory purposes.

As employees of the PSP, the Troopers were "Commonwealth parties" "only with respect to [actions taken] within the scope of [their] office or employment." 42 Pa. Cons. Stat. § 8501. In *Natt v. Labar*, 543 A.2d 223 (Pa. Commw. Ct. 1988), the Pennsylvania Commonwealth Court articulated the standard for determining whether an action is taken within the scope of an individual's employment:

> Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not unexpected by the employer.

543 A.2d at 225. Given that the instant case arose out of an arrest made by police officers during the course of a traffic stop, it is axiomatic that the first three factors discussed in *Natt* weigh in favor of a finding that the Troopers were acting within the scope of their

---

[23] The statutory waiver of sovereign immunity contained in 42 Pa. Cons. Stat. § 8522(b) extends only to cases involving the following nine categories: (1) vehicle liability; (2) medical-professional liability; (3) the care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa. Cons. Stat. § 8522(b)(1)–(9).

employment.  The relevant question is whether the force allegedly used by the Troopers in this case was of the kind that may reasonably be expected of a police officer under similar circumstances.  *Zion v. Nassan*, 283 F.R.D. 247, 266 (W.D. Pa. 2012).

Under Pennsylvania law, "an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of [his or her] employment."  *Costa v. Roxborough Memorial Hospital*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998).  To go beyond the scope of employment, however, an individual engaging in conduct that is otherwise incidental to the performance of work-related duties must act with a high degree of outrageousness.  *Haas v. Barto*, 829 F. Supp. 729, 734–35 (M.D. Pa. 1993).  An act may fall within the scope of an individual's employment even if his or her employer expressly forbids it.  *Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2000).  Given the nature of police work, it is reasonably expected that officers conducting a traffic stop may use force in certain circumstances.  *Howard v. Zaney Bar*, 85 A.2d 401, 403 (Pa. 1952).  Nothing in the complaint suggests that the Troopers used deadly weapons or otherwise placed Ickes at serious risk of permanent injury.  *Zion*, 283 F.R.D. at 264–68.  Ickes alleges only that the "roughhouse tactics" employed by the Troopers "caus[ed] his wrists to bleed," leaving him with "scratches and bruises."  (ECF No. 1-2 ¶ 15).  Even if the level of force used by the Troopers was unjustified, it was not sufficiently outrageous to place their conduct beyond the scope of their employment.  *Ash v. 627 Bar, Inc.*, 176 A.2d 137, 140 (Pa. Super. Ct. 1961).  The motion to dismiss filed by the Commonwealth parties will be granted with respect to the assault and battery claims asserted against them.

The PSTCA provides that, except as otherwise specified therein, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. § 8541. The statutory waiver of sovereign immunity applicable to local agencies and employees is found at 42 Pa. Cons. Stat. § 8542(a), which provides that, under certain conditions, "[a] local agency shall be liable for damages on account of an injury to a person or property . . . if . . . the injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties."[24] The term "negligent acts," as used in § 8542(a), does not include actions or conduct "constitut[ing] a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8542(a)(2). An employee of a local agency may be held liable for damages caused by actions taken "within the scope of his office or duties only to the same extent as his employing local agency." 42 Pa. Cons. Stat. § 8545. That limitation, however, does not apply when it is judicially determined that "the act of the employee caus[ing] the injury . . . constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. Unlike employees of the Commonwealth, who are immunized from liability for intentional torts committed within the scope of their employment, employees of local agencies may be

---

[24] A local agency may be held liable only for negligent acts falling within the following eight categories: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) the care, custody, or control of animals. 42 Pa. Cons. Stat. § 8542(b)(1)–(8).

held liable for tortious actions taken with the requisite degree of culpability.[25]  *Yakowicz v. McDermott*, 548 A.2d 1330, 1334 n.5 (Pa. Commw. Ct. 1988).

In order to establish that a police officer's use of force constituted "willful misconduct" for purposes of the PSTCA, a plaintiff must demonstrate that the officer *intentionally* or *knowingly* used force that was unnecessary or excessive.  *Renk v. City of Pittsburgh*, 641 A.2d 289, 293–94 (Pa. 1994).  At the present stage, Ickes can proceed with his assault and battery claims against Givler only by alleging that Givler "*intentionally* committed these intentional torts."  *Kuzel v. Krause*, 658 A.2d 856, 860 (Pa. Commw. Ct.

---

[25] Because Ickes does not adequately state procedural due process claims against the Troopers, the Court has no occasion to consider the circumstances in which Pennsylvania may constitutionally immunize Commonwealth employees for intentional actions constituting willful misconduct.  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 n.4 (1998) (declining to consider "the adequacy of California's post-deprivation scheme" because the parties bringing a substantive due process claim had not argued that they "were denied due process of law by virtue of the fact that California's post-deprivation procedures and rules of immunity ha[d] effectively denied them an adequate opportunity to seek compensation for the state-occasioned deprivation of their son's life").  Nonetheless, it is worth noting that an adequate post-deprivation remedy is *constitutionally required* whenever the random, unauthorized actions of a state official cause an individual to suffer an intentional "deprivation" of his or her life, liberty, or property.  *Zinermon v. Burch*, 494 U.S. 113, 128–29 (1990) (explaining that, where a state employee wrongfully "deprives" an individual of a liberty or property interest without a hearing, the employing State can satisfy the requirements of the Due Process Clause "by making available a tort remedy that could adequately redress the loss"); *Daniels v. Williams*, 474 U.S. 327, 333 (1986) (holding that no procedure for compensation was *constitutionally* required only because "a government official's act causing injury to life, liberty, or property" had been "merely negligent"); *Hudson v. Palmer*, 468 U.S. 517, 535 (1984) (holding that a plaintiff had no procedural due process claim because Virginia law did not immunize state officials from liability for intentional torts, and because it had already been determined that the plaintiff's tort claim "would not be barred by sovereign immunity"); *Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981) (holding that a plaintiff could not establish a violation of his procedural due process rights because Nebraska law provided him with a post-deprivation remedy that could fully compensate him for the "deprivation" of property alleged); *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir. 2001) (holding that a plaintiff had no procedural due process claim because the PSTCA did not immunize local employees for intentional actions constituting willful misconduct).

1995) (emphasis added).  When viewed in the light most favorable to Ickes, the complaint surmounts that hurdle.  Ickes alleges that Givler held him down while the Troopers were engaging in "harmful and offensive conduct."  (ECF No. 1-2 ¶ 20).  In a separate averment, Ickes claims that "statements" made by the arresting officers suggested that they had "agreed to assault [and] batter him."  (*Id.* ¶ 30).  The motion to dismiss filed by the Township parties will be denied with respect to the assault and battery claims asserted against Givler in his personal capacity.  Since the "negligent" conduct for which the Township may be held liable under the PSTCA does not include the "willful misconduct" allegedly engaged in by Givler, the assault and battery claims brought against the Township will be dismissed.  42 Pa. Cons. Stat. § 8542(a)(2).

J.        **The Abuse of Process Claims**

In the complaint, Ickes asserts claims against Laskey and Grassmeyer for "abuse of process."  (ECF No. 1-2 ¶¶ 27–28).  "The common law tort of abuse of process involves the perversion of legal process *after it has begun* in order to achieve a result for which the process was not intended."  *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa. Super. Ct. 1994) (emphasis added).  A cause of action arises when the legal process is employed "as a tactical weapon to coerce a desired result that is not the legitimate object of the process."  *McGee v. Feege*, 535 A.2d 1020, 1026 (Pa. 1987).  No liability exists when a defendant proceeding with bad intentions merely carries out the process to its authorized conclusion.  *Shaffer v. Stewart*, 473 A.2d 1017, 1019 (Pa. Super. Ct. 1984).  In order for a claim to accrue, the legal process must ordinarily be used "to coerce or compel the

plaintiff to take some collateral action." *Al Hamilton Contracting Co.*, 644 A.2d at 192. A

cognizable claim for abuse of process can arise in the criminal or civil context. *General*

*Refractories Co. v. Fireman's Fund Insurance Co.*, 337 F.3d 297, 306 (3d Cir. 2003).

Ickes alleges that "Laskey and Grassmeyer abused the legal process by maliciously

overcharging [him] with an array of often trifling charges." (ECF No. 1-2 ¶ 28). Since

Ickes' claims appear to be based on the *initiation* of criminal charges rather than on a

*misuse* of the criminal process, they are not cognizable under an "abuse of process" theory.

*Sabella v. Estate of Milides*, 992 A.2d 180, 188 (Pa. Super. Ct. 2010). The claims are likewise

deficient if they are construed to be malicious prosecution claims. To hold Laskey and

Grassmeyer liable for malicious prosecution in the criminal setting, Ickes would need to

establish that the criminal proceedings were terminated in his favor. *Corrigan v. Central*

*Tax Bureau of Pa., Inc.*, 828 A.2d 502, 505 (Pa. Commw. Ct. 2003). Sixteen of the eighteen

criminal charges brought against Ickes resulted in convictions. (ECF No. 7-2 at 2–8). Ickes

does not allege that Laskey and Grassmeyer lacked probable cause to charge him with the

offenses of which he was ultimately acquitted.[26] (ECF No. 1-2 ¶¶ 17, 18, 28, 30). Even if

the complaint did state viable claims for abuse of process or malicious prosecution,[27] the

---

[26] Because Ickes does not allege that probable cause was lacking in relation to the two offenses of which he was eventually acquitted, the Court has no occasion to consider the more complicated question of whether he could otherwise proceed with malicious prosecution claims by isolating those charges from the charges resulting in convictions. *Kossler v. Crisanti*, 564 F.3d 181, 186–95 (3d Cir. 2009).

[27] Pennsylvania's Dragonetti Act, 42 Pa. Cons. Stat. § 8351 *et seq.*, subsumes the torts of abuse of process and malicious prosecution in the context of *civil* proceedings. *Stone Crushed Partnership v. Jackson*, 908 A.2d 875, 877 n.1 (Pa. 2006). Since Ickes' claims arise out of a criminal prosecution, they are governed by Pennsylvania common law. *Allen v. Pennsylvania Society for the Prevention of Cruelty to Animals*, 488 F. Supp. 2d 450, 470 (M.D. Pa. 2007).

Sovereign Immunity Act would nevertheless bar those claims. *La Frankie v. Miklich*, 618 A.2d 1145, 1147–49 (Pa. Commw. Ct. 1992). For these reasons, the Court will dismiss the "abuse of process" claims contained in the complaint.

### K.        The Trespass and Conversion Claims

An individual commits the tort of trespass to chattels by intentionally dispossessing another person of a chattel or intermeddling with a chattel in another person's possession. *Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700, 708 (Pa. Super. Ct. 2005). If the interference with the owner's right of possession is sufficiently severe to permanently deprive him or her of that right, the trespass culminates in a conversion. *Baram v. Farugia*, 606 F.2d 42, 43–44 (3d Cir. 1979). A conversion can occur even if the defendant does not appropriate the property for his or her own use. *Central Transport, LLC v. Atlas Towing, Inc.*, 884 F. Supp. 2d 207, 218–19 (E.D. Pa. 2012). Ickes alleges that the arresting officers committed the torts of trespass and conversion by "permanently depriv[ing]" him of his window, clothing, groceries, and medicines. (ECF No. 1-2 ¶¶ 21–24). These claims are directed primarily at Laskey and Grassmeyer, the officers who allegedly "ordered" and "effected the destruction" of Ickes' property. (*Id.* ¶ 22).

Trespass to chattels and conversion are both intentional torts. *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 233 (E.D. Pa. 2012). They do not sound in negligence.[28] *Adams v. Ryan & Christie Storage, Inc.*, 563 F. Supp. 409, 412 (E.D. Pa. 1983) (describing "the concept

---

[28] Since Ickes alleges that Laskey and Grassmeyer "ordered" and "effected the destruction" of his property, his claims are not premised on *negligent* acts falling within the statutory waiver of sovereign immunity pertaining to claims involving "[t]he care, custody or control of personal property in the possession or control of Commonwealth parties." 42 Pa. Cons. Stat. § 8522(b)(3).

of conversion which prevails in Pennsylvania" as "a concept a long distance from negligence"). Commonwealth parties are immune from liability for damages attributable to intentional torts. *Williams v. Stickman*, 917 A.2d 915, 917 (Pa. Commw. Ct. 2007). Although employees of local agencies may be held liable for "willful misconduct," Ickes does not specifically allege that Givler was involved in the seizure or destruction of his personal property. (ECF No. 1-2 ¶¶ 21–24). Accordingly, the Defendants' motions to dismiss will be granted with respect to Ickes' trespass and conversion claims.

### L.     The Civil Conspiracy Claims

Ickes asserts claims against the Defendants for civil conspiracy. (ECF No. 1-2 ¶¶ 29–30). To successfully establish liability for civil conspiracy, a plaintiff must demonstrate that two or more defendants "acted in concert to commit an unlawful act or [to commit] a lawful act by unlawful means, and that they acted with malice." *Skipworth v. Lead Industries Association, Inc.*, 690 A.2d 169, 174 (Pa. 1997). In the complaint, Ickes avers that certain "statements" made by the arresting officers suggested that they had "agreed to assault [and] batter him." (ECF No. 1-2 ¶ 30). By claiming that his arrest was effectuated through the use of excessive force with concomitant assaults and batteries, Ickes alleges that the arresting officers employed unlawful tactics to secure an otherwise lawful objective. *Lora-Pena*, 529 F.3d at 506.

Under the Sovereign Immunity Act, the Commonwealth parties may not be held liable for civil conspiracy. *Ismael v. Ali*, 276 F. App'x 156, 158–60 (3d Cir. 2008) (unpublished). Ickes accuses Givler of holding him down while the Troopers were

physically engaging in "harmful and offensive conduct." (ECF No. 1-2 ¶ 20). Unlike the Troopers, Givler may be sued for tortious actions constituting "willful misconduct." 42 Pa. Cons. Stat. § 8550. Those actions, however, do not fall within the category of "negligent acts" for which the Township itself may be held liable. *Id.* § 8542(a)(2). "[A] local agency may not be held liable for the willful misconduct of its employees." *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1022 (Pa. Commw. Ct. 2014). Therefore, the civil conspiracy claims asserted against the Commonwealth parties and the Township will be dismissed. The motion to dismiss filed by the Township parties will be denied with respect to the civil conspiracy claim brought against Givler in his personal capacity.

M.      **The Negligent Supervision Claims**

In the complaint, Ickes alleges that Grassmeyer and Givler were entrusted with special responsibilities over their subordinates, and that they "failed to adequately train, supervise and discipline their respective men." (ECF No. 1-2 ¶ 32). Although these claims sound in negligence, they do not fall within the waivers of sovereign immunity contained in the Sovereign Immunity Act and the PSTCA. *Clark v. Southeastern Pennsylvania Transportation Authority*, 691 A.2d 988, 992 (Pa. Commw. Ct. 1997). It is not clear whom Givler allegedly failed to train, supervise, and discipline, since he is the only member of the Township's police force mentioned in the complaint. In any event, the negligence alleged by Ickes cannot be equated with the "willful misconduct" necessary to overcome Givler's statutory immunity. *Renk*, 641 A.2d at 293–94; *Kuzel*, 658 A.2d at 859–61. The Defendants' motions to dismiss will be granted with respect to all claims relating

to the alleged failure of Grassmeyer and Givler to train, supervise, and discipline their subordinates.

## VI.    Conclusion

For the reasons stated above, the Defendants' motions to dismiss will be granted in part and denied in part.  The motion to dismiss filed by the Commonwealth parties (ECF No. 7) will be denied with respect to Ickes' Fourth Amendment claims against Laskey, Augnst, and Grassmeyer in their personal capacities, to the extent that those claims are premised on a theory of "excessive force."  The motion to dismiss filed by the Township parties (ECF No. 9) will be denied in relation to the "excessive force," assault, battery, and civil conspiracy claims asserted against Givler in his personal capacity.  Both motions will be granted in all other respects.  The Commonwealth and the Township will be dismissed as Defendants in this action.   Aside from the Fourth Amendment claims based on allegations that Laskey, Augnst, Grassmeyer, and Givler used "excessive force" in connection with Ickes' arrest, all federal claims will be dismissed.  Except for the assault, battery, and civil conspiracy claims brought against Givler, the claims arising under Pennsylvania law will also be dismissed.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**DON R. ICKES,**                            )
                                             )      **CIVIL ACTION NO. 3:13-208**
                       **Plaintiff,**        )
                                             )      **JUDGE KIM R. GIBSON**
         **v.**                              )
                                             )
**CRAIG GRASSMEYER et al.,**                 )
                                             )
                       **Defendants.**       )

## ORDER

And now, this **2ND** day of July 2014, upon consideration of the Defendants'
pending motions to dismiss, and for the reasons stated in the accompanying
memorandum opinion, **IT IS HEREBY ORDERED** that

1. The motion to dismiss filed by the Commonwealth Defendants (ECF No. 7) is
   **DENIED** with respect to the Fourth Amendment claims asserted against
   Defendants Thomas Laskey, Barry Augnst, and Craig Grassmeyer in their personal
   capacities, to the extent that those claims are premised on a theory of excessive
   force; the motion is **GRANTED** in all other respects;

2. The motion to dismiss filed by the Township Defendants (ECF No. 9) is **DENIED**
   with respect to the excessive force, assault, battery, and civil conspiracy claims
   asserted against Defendant Ronald Givler in his personal capacity; the motion is
   **GRANTED** in all other respects;

3. The Commonwealth of Pennsylvania and the Township of Greenfield are
   **DISMISSED** as defendants in this case; and

4. The Clerk of Court shall amend the caption to reflect that the Commonwealth and
   the Township are no longer Defendants in this action.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**