## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DON R. ICKES, | ) | |
| | ) | CIVIL ACTION NO. 3:13-208 |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| CRAIG GRASSMEYER, BARRY | ) | |
| AUGNST, THOMAS LASKEY, and | ) | |
| RONALD GIVLER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

This case arises from alleged violations of Plaintiff's constitutional, statutory, and common law rights during a traffic stop that took place on July 18, 2011. Presently pending before the Court are two motions for summary judgment: (1) Defendant Troopers Laskey, Augnst, and Grassmyer's[1] (the **Commonwealth Defendants**) Motion for Summary Judgment (ECF No. 44); and (2) Defendant Givler's Motion for Summary Judgment (EFC No. 48). For the reasons that follow, the Motions will be **GRANTED**.

### II.     Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1441(a).

---

[1] Defendant Grassmyer is incorrectly named in the Complaint and Caption of this case as "Craig Grassmeyer." The Court will use the proper spelling of Defendant Grassmyer's last name in this Memorandum Opinion and Order.

### III.     Background

Plaintiff, proceeding pro se, commenced this action in the Court of Common Pleas of Blair County, Pennsylvania, on August 18, 2013. (ECF No. 1-2.) The Complaint asserts claims for Assault and Battery (Count One), Trespass (Count Two), Conversion (Count Three), False Imprisonment (Count Four), Abuse of Process (Count Five), Conspiracy (Count Six), Failure to Train, Supervise and Discipline (Count Seven), and Civil Rights Violations (Count Eight). (*Id*.) Plaintiff asserted these claims against individual Defendants Craig Grassmyer, Barry Augnst, Thomas Laskey, and Ronald Givler, as well as against the Commonwealth of Pennsylvania and Greenfield Township. (*Id*.)

On September 6, 2013, Defendants removed the action to this Court. (ECF No. 1.) Defendants filed motions to dismiss, and on July 2, 2014, the Court granted those motions in part. (ECF No. 16.) Remaining in the case are (1) Plaintiff's claims against the Commonwealth Defendants in their personal capacities for excessive force under the Fourth Amendment, and (2) Plaintiff's claims against Defendant Givler in his personal capacity for excessive force under the Fourth Amendment, assault and battery, and civil conspiracy. (*Id*. at 47.) The Court dismissed the Commonwealth of Pennsylvania and Greenfield Township as defendants in the case. (*Id*.)

Defendants Laskey, Augnst, Grassmyer, and Givler filed Motions for Summary Judgment with respect to Plaintiff's remaining claims. (ECF Nos. 44, 48.) For the reasons set out in this Memorandum Opinion, the Court concludes that Defendants are entitled to judgment as a matter of law with respect to all of Plaintiff's remaining claims.

Viewed in the light most favorable to Plaintiff, the relevant facts are as follows.[2]

## A.    The Traffic Stop

Plaintiff was driving a 1996 Ford Escort southbound on SR99 through a construction zone at approximately 8:11 p.m. on July 18, 2011. (ECF No. 47-1, Ex. 1 at 0:11; ECF No. 47-1 at 5; ECF No. 53-2 at 1.) The speed limit in the construction zone was 50 miles per hour. (ECF No. 47-1 at 3.)

Trooper Thomas Laskey was on patrol that evening in a marked patrol vehicle, and was following Plaintiff's car. (Id. at 3-5.) Trooper Laskey clocked Plaintiff driving 70 miles per hour in the construction zone. (Id. at 3-5, Ex. 3 ¶ 1.) At this time, Trooper Laskey also noticed that something "did not seem right about the Ford Escort's license plate," as it did not seem to belong to any state or foreign jurisdiction with which Trooper Laskey was familiar. (ECF No. 47-1 Ex. 3 ¶ 2.) Trooper Laskey could not, however, pull Plaintiff over at this time, because the construction had caused a lane obstruction. (Id. at 5.) Plaintiff was aware that a police vehicle was behind him. (ECF No. 51-2 at 11-12.)

Plaintiff put on his right turn signal and took Exit 15 off of SR99. (ECF No. 47-1, Ex. 1 at 0:20-30; ECF No. 51-2 at 12.) Trooper Laskey then activated his siren. Plaintiff has testified that at this point, he knew that the police vehicle was attempting to pull him over. (ECF No. 47-1, Ex.

---

[2] Plaintiff filed a "Sur-Reply Brief in Support of the Motion to Strike Defendants [sic] Motion for Summary Judgment," which the Court construes as a brief in opposition to both Motions for Summary Judgment for purposes of the pending motions. (ECF No. 53.) Attached to his brief, Plaintiff includes (1) an article related to § 1983 actions, described in more detail later in this Memorandum Opinion, (2) a "Summary to Traffic Stop," which does not include evidentiary support or any reference thereto, and (3) a copy of a document Plaintiff appears to have filed in a related case in the Court of Common Pleas of Blair County, all of which the Court has reviewed. (ECF Nos. 53-1, 53-2, 53-3.) Plaintiff also filed an Appendix to his brief, which includes evidence that the Court has considered for purposes of the pending motions. Plaintiff has not specifically responded to Defendants' Concise Statements of Material Facts. (ECF Nos. 46, 50.) In deciding the pending motions, therefore, the Court has conducted a thorough review of all evidence submitted by the parties. In this Background Section, the Court will cite to the dash cam video where possible, as well as to other evidence submitted by the parties where appropriate.

1 at 0:45; ECF No. 51-2 at 12-13.) Plaintiff did not, however, pull over at this time. (ECF No. 47-1, Ex. 1 at 0:30-1:36.) Instead, Plaintiff continued north onto SR3013 and then proceeded north on Mill Road. (*Id.* at 0:30-1:36.) Plaintiff turned his vehicle into a private driveway that was secluded and difficult to see from the road, and stopped. (*Id.* at 1:30-40; ECF No. 51-2 at 12-13.)

Once Plaintiff had stopped, Trooper Laskey exited the police vehicle and approached Plaintiff's front driver side window. (ECF No. 47-1, Ex. 1 at 1:40-54.) Trooper Laskey was wearing a Pennsylvania State Trooper uniform. (*Id.* at 1:50-54.) Plaintiff remained in the car, and Trooper Laskey asked him to roll the window down. (*Id.* at 1:50-2:00.) Plaintiff refused to roll the window down, but left it open only a small amount. (ECF No. 47-1 at 5.) Trooper Laskey asked Plaintiff for his driver's license and vehicle registration. (ECF No. 47-1, Ex. 1 at 2:00-2:05.) Plaintiff refused to provide either item. Instead, he quickly flashed the documents against the window and then pulled them away. (ECF No. 47-1 at 5, 20-21 ¶ 3.) After having seen the driver's license briefly, Trooper Laskey believed that the license appeared to be an out of state license. (ECF No. 47-1 at 5.)

Trooper Laskey told Plaintiff that he needed to see the license and registration outside of the vehicle, and repeated this instruction two more times. (ECF No. 47-1, Ex. 1 at 2:40-55.) Trooper Laskey then stated that he needed the license and registration "in his hand." (*Id.* at 3:00-15.) Plaintiff refused to provide the license and registration, so Trooper Laskey walked back to the police vehicle and radioed for backup. (*Id.* at 3:10-4:05.) Trooper Laskey explained that Plaintiff "would not provide identification," and that what he had seen "did not look right." (*Id.* at 3:55-4:05.) This incident was one of the only incidents in Trooper Laskey's career

during which a motorist refused to provide identification. (ECF No. 47-1 at 21 ¶ 5.) During the encounter up until this point, Trooper Laskey was unaware of Plaintiff's identity. (Id. at ¶ 4.)

Trooper Laskey returned to Plaintiff's driver side window and repeated twice more that he needed the license and registration in his hand. (ECF No. 47-1, Ex. 1 at 4:20-5:10.) At this point, Plaintiff called 911. After verifying the information, the 911 dispatcher informed Plaintiff that he was dealing with a state trooper and that he should comply with his requests. (ECF No. 47-3 at 164-65; ECF No. 51-2 at 24.) Plaintiff continued to refuse to comply. (ECF No. 47-1, Ex. 1 at 5:00-20.) Plaintiff did not comply because he believed that he was not legally required to do so. (ECF No. 51-2 at 27.) When asked in his deposition why he continued to refuse to comply with Trooper Laskey's requests after the 911 operator instructed him to provide the documents, Plaintiff stated, "[Trooper Laskey] looked mean and menacing, and I did what I thought Title 75 says, to exhibit, and I exhibited the license in the window." (ECF No. 51-2 at 26.)

Trooper Laskey informed Plaintiff that "he needed the information and would get it one way or another." (ECF No. 47-1, Ex. 1 at 5:20-30.) Trooper Laskey continued to request the information, and at one point, he responded to an inaudible comment from Plaintiff with, "I don't care if you don't care." (Id. at 5:25-35.) Trooper Laskey also tried to open the driver's side front door, but it was locked. (Id. at 5:45-50.) In response to Trooper Laskey asking why Plaintiff would not give him the requested documents, Plaintiff argued that he did not need to give him the documents, but rather only needed to "present" his identification to Trooper Laskey. (Id. at 5:50-6:10.) Plaintiff noted that he "had been through this before." (Id. at 6:05-22.)

After examining the license plate, Trooper Laskey radioed for the tag to be run and learned that the plate was fraudulent. (Id. at 6:50-7:20; ECF No. 47-1 at 21 ¶ 5.) He also

suspected that the registration was fraudulent. (*Id.* ¶ 5.) Trooper Laskey was warned over the radio that there was an issue with the owner of the property that they were on and was notified that the Plaintiff was "under suspenders." (ECF No. 47-1, Ex. 1 at 7:50-8:10.) Trooper Laskey was also informed that Plaintiff had told the 911 operator that he was scared to roll the window down. (*Id.* at 10:15-30.) Trooper Laskey did not believe that Plaintiff had acted scared at any point. (ECF No. 47-1 at 21 ¶ 6.) When asked why he did not give Trooper Laskey his documentation, Plaintiff testified, "Because what some of the police do and you see it on TV and stuff like that, how they act, and was probably couldn't—something like that. I don't know. I just believed he wouldn't give it back." (ECF No. 51-2 at 63.)

### B.    Plaintiff's Arrest

Sergeant Barry Fry of the Greenfield Township Police Department and a state trooper eventually arrived at the scene. (ECF No. 47-1, Ex. 1 at 14:00-40.) A comment on the video can be heard indicating that the license plate had been issued by a religious organization. (*Id.* at 13:00-15.) Trooper Laskey, Sgt. Fry, and the unknown trooper approached Plaintiff's car together and Trooper Laskey again asked Plaintiff to roll his window down and give him the documents. (*Id.* at 14:40-16:00.) Plaintiff again flashed his license in the window but one of the troopers can be heard commenting that he could not see the information properly because it was "too quick" and "upside down." (*Id.* at 16:35-17:00.) Trooper Laskey then asked for the license and registration again. (*Id.* at 17:30-40.)

Troopers Grassmyer and Augnst then arrived at the scene. (*Id.* at 17:40-18:00; ECF No. 47-1 at 5.) There is no evidence that any additional officers arrived on the scene after Troopers Grassmyer and Augnst appeared. In response to questioning about the Complaint's mention of

Defendant Givler, Plaintiff stated, "The only reason he was mentioned on that is because I couldn't get the name of the other officer when I went down to the Township and talked to them, they wouldn't give me the name, so I just put down that. That was probably a typographical error on that part there . . . I did mention in there that being that he's the head of the other officers, he should train them on how to put handcuffs on somebody." (ECF No. 51-2 at 56.)

Upon arriving on the scene, Trooper Grassmyer recognized Plaintiff and identified him to the others as "Don Ickes." (ECF No. 47-1, Ex. 1 at 17:45-18:00; ECF No. 47-2 at 42 ¶ 2.) Trooper Grassmyer told the other officers, "He's fucking nuts; he'll kill us. Get him the fuck out." He also said something about a gun and Bedford County, and stated, "He's a nutcase." (ECF No. 47-1, Ex. 1 at 17:50-18:10.)

Trooper Grassmyer made these comments based on prior knowledge he had of Plaintiff from when he had been stationed in Bedford County from 1996 to 2005. (ECF No. 47-2 at 42-43 ¶¶ 3, 4.) Trooper Grassmyer testified that he knew that Plaintiff was part of the "sovereign citizen" movement, and had been involved in many run-ins with state troopers while he was in Bedford County. (Id. at 43 ¶ 4.) Trooper Grassmyer knew that there were standing orders to always send two cars to Plaintiff's home to deal with potential problems that Plaintiff might cause, and was also aware of an incident in which force had to be used against Plaintiff in the Bedford County Courthouse. (Id. at 42-43 ¶¶ 3-4.) Trooper Grassmyer was also familiar with the owner of the property in whose driveway Plaintiff had pulled over. (Id. at 43 ¶ 4.) Trooper Grassmyer knew that this individual was also a member of the sovereign citizen movement and that he had once confronted a police officer with a gun. (Id. at 43 ¶ 4.) Trooper Grassmyer

believed it was not a mere coincidence that Plaintiff had chosen to pull over in this individual's driveway. (*Id.*)

Based on this knowledge of Plaintiff's prior history of incidents with law enforcement, Trooper Grassmyer believed Plaintiff would not voluntarily exit the vehicle and would instead need to be removed from the vehicle so that he would not flee. (*Id.*) Nevertheless, Trooper Grassmyer asked Plaintiff to open the door several more times. (ECF No. 47-1, Ex. 1 at 18:10-15.) Trooper Grassmyer explained his belief that Plaintiff would not voluntarily exit the vehicle to the others present. (ECF No. 47-2 at 43 ¶ 4.) Trooper Grassmyer told Plaintiff twice that the door was "going to get opened," and also asked Plaintiff to unlock the door. (ECF No. 47-1, Ex. 1 at 18:00-30.)

When Plaintiff did not comply, Trooper Laskey went to the front passenger door and broke the window with his baton. (ECF No. 47-1, Ex. 1 at 18:30-45.) This occurred approximately 18 minutes after Trooper Laskey first activated his siren and approximately sixteen minutes after Trooper Laskey first requested Plaintiff's documentation. Trooper Laskey chose to break the window on the passenger side so that he would not injure Plaintiff. (ECF No. 47-1 at 22 ¶ 8.) At this point in the dash cam video, Plaintiff's shadow can be seen in the front driver side mirror, showing that he was on that side of the vehicle when the window was broken. (ECF No. 47-1, Ex. 1 at 18:30-55.)

Someone yelled one final time, "Get out of the car," and Plaintiff can be heard screaming before anyone has reached into the car to pull him out. (*Id.* at 18:30-50.)[3] Trooper Laskey then

---

[3] Plaintiff testified that no one asked him to get out of the car, but this command can be heard clearly on the dash cam video of the incident. (*See* ECF No. 47-1, Ex. 1 at 18:30-50.) Because no reasonable juror could conclude that Plaintiff was never asked to get out of the car, the Court will view this fact in the light depicted in the dash cam

reached through the broken window and unlocked and opened the passenger side door, at which point Trooper Laskey states that Plaintiff pressed his body against the driver side door, as far as possible from Trooper Laskey. (ECF No. 47-1 at 22 ¶ 8.) Plaintiff disputes this fact, and asserts that he did not press himself against the left side of the vehicle. Plaintiff also states that he tried to unlock the door himself after the second blow, but that he was unable to do so "[b]ecause the glass broke out." (ECF No. 51-2 at 35-36.) Plaintiff did testify, however, that he had been "hunched over against the left side of the car." (Id. at 65.) Plaintiff also acknowledged that one of the officers opened the door and that at no point did he attempt to get out of the vehicle on his own. (Id. at 35-37.)

Trooper Laskey reached into the vehicle and grabbed Plaintiff's wrists to pull him from the vehicle. (ECF No. 47-1 at 22 ¶ 8; ECF No. 51-2 at 39.) Trooper Laskey pulled Plaintiff through the open door and not through the broken window. (ECF No. 47-1 at 22 ¶ 8; ECF No. 51-2 at 65.) There is a dispute as to how many officers pulled Plaintiff from the vehicle. Defendants state that only Trooper Laskey was involved in pulling Plaintiff from the vehicle. (ECF No. 46 ¶ 120.) Plaintiff, however, maintains that two officers pulled him out of the vehicle. (ECF No. 51-2 at 36-37.) Plaintiff testified that the troopers were "not calm" when they pulled him out of the car, and that they "just kind of rolled [him] around and drug [him] over the grass." He also testified that he was "taken over away from the car and put face through— thrown face-first down into the gravel driveway." (Id. at 38.) Plaintiff testified that he asked the troopers to "watch [his] shoulder," because both of his shoulders "are bad." (Id. at 41.)

---

video for purposes of deciding the pending motions for summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Once Plaintiff was outside of the vehicle, Sgt. Fry assisted Trooper Laskey in placing Plaintiff face down on the ground, where Defendants state that Plaintiff placed his left arm under his body. (ECF No. 47-1 at 22 ¶ 9.) Trooper Laskey gave Plaintiff several orders to comply while being handcuffed. (ECF No. 47-1, Ex. 1 at 19:30-20:00.) Trooper Grassmyer ordered Plaintiff to "knock it off." (Id. at 19:45-20:00.) Plaintiff testified that he did not resist having his handcuffs put on, and that his arm was beneath his body as a result of the force of having been "thrown . . . down on the ground." (ECF No. 51-2 at 42.) There is no dispute, however, that Trooper Laskey and Sgt. Fry had to use force to bring Plaintiff's arm from behind his back so that he could be handcuffed. (ECF No. 46 ¶ 128; ECF No. 51-2 at 42.) Once handcuffed, Plaintiff stood up with the assistance of the officers. (ECF No. 47-1 at 22 ¶ 9; ECF No. 51-2 at 43.)

Trooper Laskey placed Plaintiff in the back seat of the police cruiser and secured him in the vehicle with a seat belt. (ECF No. 47-1 at 22 ¶ 10.) On the dash cam video, Plaintiff can be heard saying "ouch" repeatedly. (ECF No. 47-1, Ex. 1 at 22:00-22:20.) Plaintiff explained that his hands were behind his back, so he could not sit down, to which Trooper responded by ordering Plaintiff to sit down. (Id. at 22:10-22:20.) Trooper Laskey tightened the seat belt until it locked, which is standard practice when restraining suspects traveling in police cruisers. (ECF No. 47-1 at 22 ¶ 10.) Plaintiff testified that Trooper Laskey tightened his seatbelt "[e]xtremely tight." (ECF No. 51-2 at 46.) Plaintiff also testified that Trooper Laskey "hit [him] in the chest, [and] drove [him] up against the seat," and then explained that Trooper Laskey "drove [him] back up against the seat because [he] was sitting forward." (Id. at 45-46.) Trooper Laskey states that he never struck Plaintiff and Plaintiff acknowledged in his deposition that he was sitting forward in the police cruiser. (ECF No. 47-1 at 22 ¶ 10.)

For approximately 15 minutes, Plaintiff did not appear to say anything, after which time Plaintiff told Trooper Laskey his belief that his vehicle could not be towed without a warrant. (ECF No. 47-1, Ex. 1 at 38:00-38:25.) Plaintiff repeated this complaint approximately five minutes later. (*Id.* at 43:50.) Plaintiff did not make any complaints about his physical condition until approximately twenty minutes after he had been secured in the cruiser with a seatbelt, at which point he stated that his hands were getting numb. (*Id.* at 43:45-55.)

After the Ford Escort Plaintiff had been driving was towed, Trooper Laskey began driving Plaintiff to the police station. (*Id.* at 56:10-15.) While on the way to the station, Plaintiff stated that his shoulders and wrists hurt, which was his first complaint of pain since he had been secured by the seatbelt in the cruiser. (*Id.* at 59:20-40.) Trooper Laskey responded that he felt discomfort because he was in handcuffs. (*Id.* at 59:25-35.) Plaintiff's next complaint was approximately eight minutes later, at which point he asked to be taken to the hospital and then, for the first time, complained of chest pains. (*Id.* at 1:07:30-1:08:20.) At this point, Trooper Laskey immediately turned around, put the sirens on, and drove toward Nason Hospital. (*Id.* at 1:08:20-1:09:30.)

Approximately four minutes later, Trooper Laskey and Plaintiff arrived at the hospital, accompanied by Troopers Grassmyer and Augnst. (*Id.* at 1:12:00-10.) Once there, Plaintiff's handcuffs were removed. (ECF No. 47-1 at 23 ¶ 11.) The parties dispute whether Plaintiff's handcuffs had been placed on his wrists more tightly than usual. The Commonwealth Defendants state that the handcuffs had not been placed on Plaintiff's wrists too tightly, and that they were removed from Plaintiff's wrists without incident. (*Id.* ¶ 11.) Plaintiff's treating physician did not recall any difficulty with regard to the removal of Plaintiff's handcuffs. (ECF

No. 47-4 at 29.) Plaintiff, however, testified that the handcuffs were placed on his wrists too tightly, such that it was difficulty to remove them when he had arrived at the hospital. (ECF No. 51-2 at 48-49.) Plaintiff did not testify or present evidence as to any injury caused by the handcuffs.

It did not appear to the Commonwealth Defendants that Plaintiff was injured in any way related to his arrest. (ECF No. 47-1 at 23 ¶ 12; ECF No. 47-2 at 43 ¶ 9, 47 ¶ 10.) Plaintiff was treated at the hospital by Dr. Steven Um. (ECF No. 47-4 at 17.) Plaintiff told Dr. Um that he had experienced chest pains since 5:00 p.m., which was several hours before his encounter with the police began. (*Id.* at 18.) Plaintiff had no injuries other than some abrasions on his right forearm. (*Id.* at 20-21.) Plaintiff had no bruising or bleeding except for a bit of dried blood on his wrist. (*Id.* at 21.) Plaintiff has submitted photographs, taken in October 2015, which purportedly depict the shirt he wore during the incident. These photographs show blood stains on the back, bottom portion of the shirt. (*See* ECF No. 54-8.) Dr. Um recommended that Plaintiff stay at the hospital overnight based on the chest pains that he stated he had experienced since 5:00 p.m. that evening. There is no indication that any doctor recommended that Plaintiff stay overnight at the hospital based on the bruising and bleeding of his right forearm and wrists. (ECF No. 47-4 at 21-22.) Plaintiff refused to check in to the hospital, however, and was discharged. (*Id.* at 23.)

**C.     Plaintiff's Invalid Documentation and Involvement in the Embassy of Heaven**

Defendants learned that Plaintiff's Pennsylvania driver's license had been suspended, and the license briefly flashed to Trooper Laskey in the window was a Florida driver's license. (ECF No. 47-1 at 97; ECF No. 47-2 at 2.) Plaintiff did not hold any valid registration for the Ford Escort; the vehicle had a Florida registration issued to Louis Holzapple. (ECF No. 47-1 at 6; ECF

No. 47-2 at 6.) The registration that Plaintiff had flashed in the window was invalid and had been issued by an organization called the "Embassy of Heaven." (ECF No. 47-1 at 5; ECF No. 47-2 at 10.) The license plate on the vehicle had also been issued by this organization. (ECF No. 47-1 at 5; ECF No. 47-2 at 10.) Plaintiff acknowledged in his deposition that he had obtained the registration and license plate through a church and an individual named Yahkob Therlow who was involved with the Embassy of Heaven organization. (ECF No. 51-2 at 16-20.)

The Embassy of Heaven is an organization from Oregon which calls itself "God's Government on Earth." (ECF No. 47-1 at 5.) There is a statement on file with the organization that is signed by Plaintiff in which he renounced his allegiance to the world and declared his citizenship in the "Kingdom of Heaven." (ECF No. 47-2 at 10.) Plaintiff denied, however, having heard of the Embassy of Heaven and also denied that his status as a "sovereign man" was the reason for which he refused to comply with Trooper Laskey's requests. (ECF No. 51-2 at 20-23.)

The Embassy of Heaven's webpage includes a quote that reads, "Grownups have been tricked into obeying the laws of humbugs, rather than the laws of God. When Americans stopped believing that God rules them and the world, Americans stopped being free. That means they are slaves to the humbugs and ruled by wizards." (ECF No. 47-2 at 14.)

The webpage also includes a link to a book called "Going to Jail," which is available to read online and can also be purchased, and which prepares and encourages members of the Embassy of Heaven to go to jail for resisting the authority of the state. (*Id.* at 17.) The introduction of the book explains that members of the Embassy of Heaven do not obtain permission from the state to do anything, because those who God commissions are not required to ask for permission. (*Id.* at 20.) The book explains what members should do when pulled over

by a police officer while driving, and states that having a license plate issued by the Embassy of Heaven will cause members' cars to be pulled over. (*Id.* at 23.) The book suggests that members do not need to provide state-issued identification to police officers, and encourages members to go to jail rather than identify themselves per the officers' orders. (*Id.* at 24.) The book also suggests that police officers do not have to use handcuffs when transporting an arrested person to jail. (*Id.* at 29.)

The book provides stories for members, intended to "run [members] through multiple scenarios . . . [and] take a little bit of the fear out of going to jail." (*Id.* at 26.) Certain of these stories include examples of members who have been pulled over by police officers and include scenarios – similar to those present here—in which members were traveling with invalid forms of vehicle registration and personal identification and refused to comply with the instructions of police officers. (*Id.* at 32-36.)

## IV.    Standard of Review

Summary judgment is appropriate only where there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010).  Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v.*

*Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## V. Discussion

The Court will address the Commonwealth Defendants' Motion for Summary Judgment (ECF No. 44) first, followed by Defendant Givler's Motion for Summary Judgment (ECF No. 48.) Because the Court concludes that there is no genuine issue of material fact with respect to any claim against the remaining Defendants, both motions will be granted.

**A.      The Commonwealth Defendants' Motion for Summary Judgment**

The Commonwealth Defendants move the Court to grant summary judgment with respect to Plaintiff's only remaining claim against them, which is the § 1983 claim for excessive use of force under the Fourth Amendment. (ECF No. 44.) The Commonwealth Defendants make two arguments in support of this motion. First, the Commonwealth Defendants argue that they are entitled to summary judgment because there is no dispute of material fact as to whether excessive force was used against Plaintiff. (ECF No. 45 at 3-10.) In the alternative, the Commonwealth Defendants argue that summary judgment is proper because they are entitled to qualified immunity. (*Id.* at 10-11.)

Plaintiff filed a "Brief in Support of the Motion to Strike Defendants [sic] Motion for Summary Judgment." (ECF No. 53.) Because there is no motion to strike Defendants' motions for summary judgment on the docket in this matter, the Court will construe this brief and its attachments as a response in opposition to Defendants' Motions for Summary Judgment. Plaintiff devotes much of the first six pages of the brief to an explanation of the summary judgment standard in both state and federal court. (*Id.* at 1-6.) The Court will apply the well-established summary judgment standard that applies in federal court, outlined above.

In addition to citing case law related to the summary judgment standard, Plaintiff also argues that "[d]iscovery would not only be useful but is necessary to clarify the Brief in Support of the Motion to Strike DEFENDANTS [sic] Motion for Summary Judgment and/or to Oppose the Grant of Summary Judgment." (*Id.* at 6-7.) The Court notes at the outset that discovery in this matter closed on January 21, 2015. (*See* ECF No. 29.) The question here is not whether

discovery would be useful, but rather whether genuine questions of material fact exist that necessitate a trial in this matter.

Attached to Plaintiff's brief is what appears to be a newsletter article discussing the United States Supreme Court case of *Heck v. Humphrey*, 512 U.S. 477 (1994). ([ECF No. 53-1](#).) In *Heck*, the Supreme Court articulated a doctrine which states generally that a prisoner seeking damages for unconstitutional conviction or imprisonment must have his or her conviction or sentence reversed on appeal or otherwise declared invalid before his or her § 1983 claim may proceed, and that conversely, a claim for damages stemming from a conviction or sentence that has not been so invalidated is not cognizable under § 1983. *See Heck*, 512 U.S. at 489-90. The Court has reviewed this article in its entirety and is familiar with the *Heck* doctrine, but notes that this case and its potential reach—which is the focus of the article Plaintiff supplies—have little, if any, impact on the matters before the Court.

Viewing the record in the light most favorable to Plaintiff, the Court concludes as a matter of law that the Commonwealth Defendants did not use excessive force during Plaintiff's arrest. In the alternative, the Court concludes that even if, arguendo, the Commonwealth Defendants did use excessive force, they are entitled to qualified immunity. Under either argument, therefore, the Court must grant the Commonwealth Defendants' Motion for Summary Judgment.

### 1. Excessive Force

There is a dispute as to whether one or more of the Commonwealth Defendants used force during Plaintiff's arrest. The Commonwealth Defendants have presented evidence that neither Defendant Grassmyer nor Defendant Augnst used force against Plaintiff at any time

during his arrest. Plaintiff's deposition testimony, however, while unclear on this point, suggests that at times, two or more of the Commonwealth Defendants were involved in pulling Plaintiff from the vehicle and handcuffing him. Viewing the evidence in the light most favorable to Plaintiff, the Court will assume for purposes of this motion that Defendants Grassmyer and Augnst were also involved in these uses of force. With respect to Trooper Laskey, the Commonwealth Defendants do not contest that Trooper Laskey used force to effectuate Plaintiff's arrest, but argue that the amount of force used was reasonable under the circumstances.

In evaluating whether Plaintiff's rights were violated by the Commonwealth Defendants' use of force, "the inquiry is whether [the Commonwealth Defendants'] actions were objectively reasonable in light of the facts and circumstances confronting [them], without regard to [their] underlying intent or motivations." *Brown v. Rinehart*, 325 Fed.Appx. 47, 50 (3d Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Determining whether the use of force is reasonable is largely a fact specific inquiry. *See Reiff v. Marks*, No. 08-CV-5963, 2011 U.S. Dist. LEXIS 18205, at *17, 2011 WL 666139 (E.D. Pa. Feb. 23, 2011). Thus, "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). Nonetheless, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004).

In assessing whether an action was objectively reasonable, a court must consider the severity of the crime, whether the suspect posed an immediate threat to public safety, and

whether the suspect was resisting or evading arrest. *Woods v. Grant*, 381 Fed.Appx. 144, 146 (3d Cir. 2010); *Graham*, 490 U.S. at 396. Courts in the Third Circuit have added to these three factors, such that to properly consider whether an officer's conduct was objectively reasonable under the Fourth Amendment, courts should evaluate the following nine factors: (1) the severity of the crime; (2) whether the suspect posed an imminent threat to the safety of the officer or others; (3) whether the suspect actively resisted or attempted to evade arrest; (4) whether the force used was of such an extent as to lead to injury; (5) the possibility that the suspect was violent or dangerous; (6) the duration of the officer's action; (7) whether the action took place in the context of making an arrest; (8) the possibility that the suspect was armed; and (9) the number of persons with whom the officer had to contend at the time. *See Hrezik v. Moyer*, 2012 WL 162334, at *6-7 (E.D. Pa. Jan. 19, 2012) (citing *Graham*, 490 U.S. at 396; *Brown*, 325 Fed.Appx. at 50-51; *Sharrar v. Felsing*, 128 F.3d 810, 821 (3d Cir. 1997); *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005)).

The totality of the circumstances presented here, guided by the analysis of the nine factors that follows below, leads the Court to conclude that the Commonwealth Defendants' actions were objectively reasonable and therefore did not run afoul of the Fourth Amendment.

a.  **Factors One (the Severity of the Crime), Two (Whether the Suspect Posed an Imminent Threat to the Safety of the Officers or Others), Five (the Possibility That the Suspect Was Violent or Dangerous), and Eight (the Possibility that the Suspect Was Armed)**

While Plaintiff's original traffic violation was relatively minor, Plaintiff's subsequent actions—including his refusal to produce identification, coupled with his fraudulent license and license plate—are more serious violations that raised the potential for additional crimes. The

officers were also aware of Plaintiff's background and that he was known to have threatened police officers in the past. Additionally, during the initial traffic stop, Plaintiff passed many locations where he could have easily pulled over. Instead, Plaintiff drove to a secluded driveway owned by a member of the sovereign citizen movement who was known to have pulled a gun on police officers in the past. As the Commonwealth Defendants note, the troopers had no way of knowing whether Plaintiff had a weapon in the vehicle or whether the owner of the property had a weapon that may have placed one or more of them at risk.

These circumstances certainly raised the possibility that Plaintiff posed a threat to the safety of the officers, that Plaintiff could be violent or dangerous, and that Plaintiff was armed. Plaintiff has presented no evidence that would permit a reasonable juror to conclude otherwise. Prongs One, Two, Five, and Eight therefore weigh in favor of a finding that the use of force was objectively reasonable.

> ### b. Factor Three (Whether the Suspect Actively Resisted or Attempted to Evade Arrest)

On August 22, 2013, a jury convicted Plaintiff of resisting arrest. (*See* ECF No. 7-2 at 2.) Such a conviction does not "summarily block a plaintiff from bringing an excessive force claim." *Garey v. Borough of Quakertown*, No. 12-CV-799, 2013 U.S. Dist. LEXIS 91798, at *17-18, 2013 WL 3305222 (E.D. Pa. July 1, 2013). Here, however, Plaintiff's own testimony supports a finding that he resisted arrest, and Plaintiff has supplied no other evidence to contest such a finding. Plaintiff testified that he refused to comply with Trooper Laskey's requests because he believed he was not legally obligated to do so. (ECF No. 51-2 at 26.) There is also uncontested evidence in the record that the Commonwealth Defendants instructed Plaintiff to unlock the

door to his vehicle and to exit the vehicle and that he did not comply with these requests. ([ECF No. 47-1, Ex. 1 at 18:00-30](#).) There is a dispute as to whether Plaintiff intentionally resisted being handcuffed while outside of the car by placing his arm beneath his body. There is no dispute, however, as to the fact that Trooper Laskey gave Plaintiff several orders to comply and told him to "knock it off" while being handcuffed. (*Id*. at 19:30-20:00.) It is also undisputed that Trooper Laskey and Sgt. Fry had to use force to bring Plaintiff's arm from behind his back while he was on the ground so that he could be handcuffed. (*Id*.)

These undisputed facts, coupled with Plaintiff's conviction for resisting arrest, establish that Plaintiff resisted the troopers' attempts to effectuate his arrest, and there is no evidence in the record that would permit a reasonable juror to reach a contrary conclusion. This prong therefore weighs in favor of a finding that the force used was objectively reasonable.

### c. Factor Four (Whether the Force Used Was of Such an Extent as to Lead to Injury)

Prong four assesses whether the force used was of such an extent as to lead to injury. While the record shows that Plaintiff went to the hospital after his arrest, the uncontested evidence establishes that he was treated only for chest pains that he had been experiencing all evening on July 18, 2011, and that this pain did not stem from any force used by one or more of the Commonwealth Defendants. ([ECF No. 47-4 at 156-73](#).) Plaintiff did not stay overnight at the hospital on July 18, 2011. (*Id*.)

Plaintiff contends that he suffered injuries from the following actions taken by one or more of the Commonwealth Defendants: (1) breaking the window of the car; (2) "throwing" Plaintiff face down onto the gravel driveway and pinning Plaintiff's arms under him; (3)

securing Plaintiff's handcuffs too tightly; (4) pushing Plaintiff into the back portion of his seat in the police cruiser; and (5) fastening Plaintiff's seatbelt too tightly. The Court will address each of these actions in turn.

With regard to actions one and two, breaking the window of the car and "throwing" Plaintiff face down onto the gravel driveway and pinning his arms under Plaintiff's body, the Court finds that the Commonwealth Defendants' interest in protecting themselves and effectuating a safe and efficient arrest justified these uses of force. The Court also finds that the record establishes that the Commonwealth Defendants acted in such a way so as to minimize the chances of Plaintiff's injury during the arrest. Trooper Laskey broke the window furthest from Plaintiff and removed him through the door after unlocking it. Plaintiff was removed from the car by his wrists, and was then secured in handcuffs as quickly as possible.

As discussed above, the circumstances present raised the strong possibility that Plaintiff could be violent or dangerous, that Plaintiff or the owner of the property could be armed, and that the officers' safety was in danger. The Commonwealth Defendants made every attempt— for approximately twenty minutes—to get Plaintiff to provide the documentation, to unlock the vehicle, and to step out of the vehicle on his own. Plaintiff gave no indication that he would comply with any request they made of him and testified that he did not believe that he had any legal duty to follow their instructions.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that, even though "throwing" someone onto gravel may raise the possibility of that person suffering cuts and scrapes, as the evidence suggests that Plaintiff did suffer, these are not the sorts of "injuries" with which this Fourth Amendment analysis is concerned. Indeed, well-settled law

establishes that the Commonwealth Defendants' conduct falls far short of excessive force in violation of the Fourth Amendment. Rather, even accepting as true that Plaintiff suffered "abrasions on [his] forearm" from his removal from the vehicle and subsequent arrest, and taking into account the photographs of Plaintiff's blood-stained shirt following his arrest, the Court concludes that these injuries are de minimis in nature and therefore do not weigh in favor of a finding that the Commonwealth Defendants' actions were objectively unreasonable. (*See* ECF No. 53-2 at 2; ECF No. 54-8.) *See Brown*, 325 Fed.Appx. at 49-51 (affirming District Court's holding of no excessive force when the defendants had removed the plaintiff from his property, pepper sprayed the plaintiff, and delivered a "stun blow" to the plaintiff's head and right thigh, after the plaintiff resisted his arrest for disorderly conduct by pulling away his hands and laying on his hands to avoid being handcuffed); *Fisher v. Matthews*, 792 F.Supp.2d 745, 775 (M.D. Pa. 2011) (no Fourth Amendment excessive force violation when "Plaintiff received very minor injuries and did not ask for or require any medical care" related to those injuries after his arrest).

Plaintiff also asserts that his Fourth Amendment rights were violated when his handcuffs were secured too tightly. The Court concludes that the evidence fails to support a finding that Plaintiff's handcuffs were placed on his wrists in such a way that would be likely to lead to injury. Plaintiff has presented no evidence of any injury resulting from the handcuffs, and the medical personnel who observed him did not remember there being any difficulty with the removal of the handcuffs. The Court notes that certain facts as to the handcuffs are in dispute. Therefore, the Court will view the evidence on this point in the light most favorable to Plaintiff, and will assume that the handcuffs did require several officers to be removed at the

hospital, and that the handcuffs were placed on Plaintiff more tightly than is usual. These facts alone, however, fall far short of establishing that the handcuffs were so tight that they were likely to cause injury. *See Godfrey v. Adamo*, 2014 WL 3453846, at *9 (W.D. Pa. July 15, 2014) (concluding that the plaintiff's claims of injury from handcuffs was "wholly unsupported by the record," and indicating that a different result may have been reached if the plaintiff had presented evidence that the defendant "placed the handcuffs on [him] so tightly as to break his wrist," or if there had been some physical manifestation or indicia that his wrist was injured).

Plaintiff testified that Trooper Laskey "hit [him] in the chest, [and] drove [him] up against the seat." To explain what he meant by "hit," Plaintiff stated that Trooper Laskey "drove [him] back up against the seat because [he] was sitting forward." ([ECF No. 51-2 at 45-46](#).) Viewing this evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not presented any evidence to suggest that Trooper Laskey hit him in such a way that was likely to or did cause him injury or that he sought treatment from any injury related to this conduct. *See Godfrey*, 2014 WL 3453846, at *9 (concluding that putting a hand on the plaintiff's chest and pushing him back into the car was objectively reasonable and did not constitute excessive force).

Lastly, Plaintiff asserts that his seatbelt was secured "extremely tight" in the cruiser. Plaintiff has provided no evidence that would allow the finder of fact to conclude that Plaintiff's seatbelt was secured in a manner that might lead to injury. Moreover, the evidence establishes that Plaintiff made no complaint about the manner in which his seatbelt was secured. Rather, the evidence shows that the seatbelt was tightened until it locked, which is standard practice

when restraining suspects traveling in police cruisers. (ECF No. 47-1 at 22 ¶ 10.) Plaintiff has presented no evidence from which a reasonable juror could conclude otherwise.

Plaintiff has presented no evidence of conduct that was of an extent likely to lead to anything other than de minimis injury. Settled case law indicates that such de minimis injuries do not rise to the level of a Fourth Amendment violation when the conduct is justified by the officers' need to effectuate a safe arrest. Therefore, the Court concludes that the fourth factor under consideration, whether the force used was of such an extent as to lead to injury, weighs in favor of a finding that the Commonwealth Defendants' conduct was objectively reasonable.

### d.  Factor Six (the Duration of the Officers' Action)

The undisputed evidence establishes that less than four minutes passed from the time Trooper Laskey broke the window of the vehicle until Plaintiff was secured by a seatbelt in the police cruiser. (*See* ECF No. 47-1, Ex. 1 at 18:30-22:00.) This evidence supports the conclusion that the duration of time was objectively reasonable, as it was no more prolonged than necessary to effectuate Plaintiff's arrest. This factor therefore weighs in favor of the Commonwealth Defendants. *Stiegel v. Peters Tp.*, 600 Fed.Appx. 60, 66 (3d Cir. 2014) (no excessive force where "the entire encounter . . . lasted only five to ten minutes.").

### e.  Factor Seven (Whether the Action Took Place in the Context of Making an Arrest)

The Supreme Court has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396-97. Here, factor seven also weighs in favor of a finding that the Commonwealth Defendants' conduct was objectively reasonable, because the

use of force occurred in the context of effectuating a lawful arrest. *See Ayala v. McCormick*, 2014 WL 1292668 (D.N.J. Mar. 31, 2014) (granting summary judgment when the "defendants' use of force took place in the context of effecting an arrest, and the defendants perceived the plaintiff to be actively resisting arrest.").

> **f.     Factor Nine (the Number of Persons With Whom the Officer Had to Contend at the Time)**

Plaintiff was the only person with whom Defendants had to contend at the time of his arrest. The Court recognizes, however, that the arrest was effectuated on the property of another individual who was known to Defendants to be a member of the sovereign citizen movement and to have confronted a police officer with a gun in the past. (*See* ECF No. 47-2 at 42-43 ¶¶ 3-4.) Based on this fact and the other circumstances present at the time of Plaintiff's arrest, the Court finds that Defendants' actions did not constitute an overwhelming show of force, particularly given Defendants' belief that Plaintiff or the property owner might be dangerous. The Court concludes, therefore, that this factor is neutral and will not affect the analysis, particularly given that the first eight factors weigh overwhelmingly in favor of a finding that the Commonwealth Defendants' actions were objectively reasonable. *See, e.g.*, *Farmer v. Riordan*, 2015 WL 1417715, at *15 (D.N.J. Mar. 26, 2015) (granting summary judgment where several officers subdued the plaintiff, who was resisting arrest); *Neuburger v. Thompson*, 305 F.Supp.2d 521, 529 (W.D. Pa. 2004) (granting motion to dismiss where "[t]he four Troopers on scene did not constitute an overwhelming show of force, although [the plaintiff] was the only individual with whom they ostensibly had to contend").

### g.    The Totality of the Circumstances

With the exception of factor nine, which is neutral, all factors weigh in favor of a finding that the Commonwealth Defendants' use of force was objectively reasonable. The court therefore concludes that no reasonable fact finder could conclude that the Commonwealth Defendants' use of force was objectively unreasonable. The Court therefore finds that there was no violation of Plaintiff's Fourth Amendment rights during the traffic stop and subsequent arrest on July 18, 2011. The Commonwealth Defendants are entitled to summary judgment in their favor on this ground. *See Mazzella v. Marzen*, 2015 WL 179091, at *10 (M.D. Pa. Jan. 14, 2015) (granting summary judgment where officer did not use more force than was necessary under the circumstances); *Leibner v. Borough of Red Bank Police Dept.*, 2013 WL 1065927, at *11 (D.N.J. Mar. 12, 2013) (granting summary judgment when "the vast majority of [the nine] factors support[ed] a finding that the Officers' use of force was reasonable under the circumstances, thus weighing against a finding of excessive force").

### 2.    Qualified Immunity

Even if, arguendo, the Court concluded that the Commonwealth Defendants' conduct constituted excessive force, the Court would still grant summary judgment in their favor on the ground that they are entitled to qualified immunity.

Qualified immunity is an affirmative defense that protects an official from suit for money damages. It is intended to "shield government officials performing discretionary functions, including police officers, 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.'" *Kopec*, 361 F.3d at 776 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

Determining whether a defendant is entitled to qualified immunity is an objective question that is decided as a matter of law. *Reiff*, 2011 WL 666139, at *5 (citing *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004)). The Court must examine the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)). The issue of qualified immunity should generally be decided as early as possible in the litigation; "[b]ecause qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The Third Circuit has cautioned, however, that where there are "facts material to the determination of reasonableness that remain in dispute," such questions should be resolved by a jury rather than by the court. *Geist v. Ammary*, 40 F.Supp.3d 467, 485 (E.D. Pa. 2014) (internal quotations omitted); *see also Barton v. Curtis*, 497 F.3d 331, 335 (3d Cir. 2007).

An officer is entitled to qualified immunity if he meets at least one of a two prong inquiry. *Patrick v. Moorman*, 536 Fed. Appx. 255, 259 (3d Cir. 2013). First, the Court must determine whether the official violated a statutory or constitutional right. Second, the Court considers whether that right was "clearly established" at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011).

A right is "clearly established" when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have

understood that what he is doing violates that right.'" *See id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (alterations in original). "If no case directly speaks to the legality of the officer's conduct, the challenged conduct [needs] to be such that reasonable officers in the defendant['s] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." *Geist*, 40 F.Supp.3d at 485 (citing *Giuffre v. Bissell*, 31 F.3d 1241, 1255 (3d Cir. 1994)) (internal quotations omitted). The reviewing court must, therefore, determine whether, under the circumstances that the officer in question encountered, a reasonable officer would have understood at that time that his actions were prohibited. "If it would not have been clear to a reasonable officer what the law required under the facts alleged, he is entitled to qualified immunity." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002).

Here, as discussed above, no reasonable juror could conclude that the Commonwealth Defendants' conduct was objectively unreasonable in violation of the Fourth Amendment. Nevertheless, the Court will assume, arguendo, that the Commonwealth Defendants did violate Plaintiff's Fourth Amendment rights. The question then becomes whether, when confronted with a motorist reasonably suspected of traffic violations who refuses to provide a valid license and registration for approximately twenty minutes and who is known to have made threats against police officers in the past, a reasonable officer would have understood that his use of force to remove that motorist from the vehicle and effectuate his arrest violates the motorist's Fourth Amendment rights.

The Court concludes that there is no case law that would have put the Commonwealth Defendants on notice that such a use of force violated Plaintiff's Fourth Amendment rights. The

Commonwealth Defendants are therefore entitled to qualified immunity on this ground as well. *See Wisneski v. Denning*, 2014 WL 1758118, at *23 n.4 (W.D. Pa. Apr. 30, 2014) (although the court had concluded that no constitutional violation had occurred, even if such a violation did occur, the defendant officers were entitled to qualified immunity after use of stun gun and force to remove the plaintiff from his car, resulting in minor scrapes and bruises to the plaintiff, because no reasonable official would have understood such actions violated a clearly established constitutional right).

### B. Defendant Givler's Motion for Summary Judgment

Defendant Givler moves the Court to grant summary judgment with regard to all remaining claims against him. (ECF No. 48.) These claims are for (1) excessive force under the Fourth Amendment, (2) assault and battery, and (3) civil conspiracy. (*See* ECF No. 16.) In support of this motion, Defendant Givler states that the undisputed evidence establishes that he was not present during or personally involved in Plaintiff's arrest. (ECF No. 49.) In fact, Defendant Givler has presented evidence that he was not on duty when Plaintiff's arrest took place. (*Id.* at 4; ECF No. 50 ¶ 7.) Plaintiff does not mention Defendant Givler in his responsive brief, nor does he respond to the arguments raised in Defendant Givler's motion for summary judgment. (*See* ECF No. 53.)

For the reasons explained below, the Court concludes that Defendant Givler has established that there is no genuine material fact as to any of the claims against him such that he is entitled to judgment as a matter of law.

### 1. Plaintiff's § 1983 Claim Against Defendant Givler

With respect to Plaintiff's § 1983 claim, the Court concludes that there is no evidence from which a reasonable juror could conclude that Defendant Givler used excessive force against Plaintiff in violation of his Fourth Amendment rights.

The uncontested evidence establishes that Defendant Givler was not present or on duty at the time of Plaintiff's arrest. (ECF No. 51-1.) Indeed, much of Plaintiff's testimony supports such a finding, including the following statements and acknowledgements during his deposition: (1) "I'm thinking what happened there, Defendant Givler never showed up. I think it was one of the other officers."; (2) "The only reason [Defendant Givler] was mentioned [in the Complaint] is because I couldn't get the name of the other officer when I went down to the Township and talked to them, they wouldn't give me the name, so I just put down that. That was probably a typographical error on that part there."; (3) in response to whether he had encountered a Greenfield Township officer prior to July 18, 2011, "Prior to being stopped or anything, not that I know of."; and (4) in response to whether Plaintiff knew Defendant Givler, Plaintiff stated, "I don't recall knowing him" and also stated that he did not recall ever having spoken to him for any reason. (ECF No. 51-2 at 53-56.)

Though he makes no mention of it in briefing, Plaintiff appears to assert during his deposition testimony that even though Defendant Givler was not personally involved in his arrest, he should nonetheless be held liable under a theory of supervisory liability. Plaintiff testified, "I did mention in there that being that [Defendant Givler is] the head of the other officers, he should train them how to put handcuffs on somebody and not to put them on too extreme that caused injuries." (*Id.* at 56-57.)

Based on the evidence described above, Plaintiff's § 1983 claim against Defendant Givler must fail for multiple reasons. As a preliminary matter, the Court already concluded that the record establishes that no constitutional violation occurred as a matter of law. Defendant Givler's motion for summary judgment should therefore be granted for that reason alone.

In addition, liability under § 1983 must be based on a defendant's "close causal connection to a plaintiff's constitutional injury." *Wall v. Dauphin County*, 2006 WL 27123, at *3 (M.D. Pa. Jan. 5, 2006) (citing *Martinez v. Cal.*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980)). "It is . . . well settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement. Each named defendant must be shown . . . to have been personally involved in the events or occurrences upon which Plaintiff's claims are based." *Fisher*, 792 F.Supp.2d at 771 (internal citations omitted). It is possible that a defendant not physically present during the alleged violation of a plaintiff's rights could still be liable for that violation, but only if the defendant "directed, knew or acquiesced in the deprivation of constitutional rights." *Wall*, 2006 WL 27123, at *3 (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1979); *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990); *Capone v. Marinelli*, 868 f.2d 102, 106 n. 7 (3d Cir. 1989); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988)).

Here, the uncontested evidence establishes that Defendant Givler was not present during or a witness to Plaintiff's arrest. Plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that Defendant Givler was personally involved in any use of excessive force against Plaintiff. Moreover, to the extent Plaintiff seeks to impose some form

of supervisory liability on Defendant Givler, he has presented no evidence to suggest that Defendant Givler directed, knew of, or acquiesced in any such violation of Plaintiff's Fourth Amendment rights, even if the Court had concluded that those rights had been violated.

For all of these reasons, the Court will grant summary judgment in favor of Defendant Givler with respect to Plaintiff's § 1983 claim against him for excessive use of force.

### 2. Plaintiff's Claim for Assault and Battery Against Defendant Givler

For similar reasons, the Court concludes that no reasonable juror could conclude that Defendant Givler committed assault or battery against Plaintiff. Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Brownstein v. Gieda*, 649 F.Supp.2d 368, 375 (M.D. Pa. 2009) (quoting *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994) (internal quotations omitted)). "An assault requires both the actor's intent to place the individual in imminent apprehension of harmful offensive contact and the individual actual imminent apprehension." *Id*. (citing *Glass v. City of Philadelphia*, 455 F.Supp.2d 302, 365-66 (E.D. Pa. 2006)).

The Court explained above that there is no genuine dispute of material fact as to whether Defendant Givler was present at the time of Plaintiff's arrest, or as to whether he was in any way involved in the incident on July 18, 2011. The Court also quoted Plaintiff's deposition testimony wherein he admitted that he only named Defendant Givler in the Complaint because he did not know the name of the "other officer" who he believed had been present at the time of his arrest. The evidence is therefore undisputed that Defendant Givler committed no assault or battery on Plaintiff and no reasonable juror could reach a contrary

conclusion. Defendant Givler's motion for summary judgment is therefore granted with respect to Plainitff's claim for assault and battery against him.

### 3. Plaintiff's Claim for Civil Conspiracy Against Defendant Givler

To establish liability for civil conspiracy, "a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Skipworth v. Lead Industries Association, Inc.*, 690 A.2d 169, 174 (Pa. 1997) (citing *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (internal quotations omitted)).

Defendant Givler has presented evidence that establishes that he was not present at the time of Plaintiff's arrest. Indeed, Plaintiff admitted in his deposition testimony that Defendant Givler was included in the Complaint only to take the place of another officer whose name he did not know. Plaintiff has proffered no evidence that would allow a juror to find in his favor on a single element of his claim for civil conspiracy against Defendant Givler. Defendant Givler's Motion for Summary Judgment is therefore granted with respect to Plaintiff's claim for civil conspiracy.

## V. Conclusion

For the foregoing reasons, Defendants Motions for Summary Judgment (ECF Nos. 44, 48) are granted, and Plaintiff's remaining claims against all Defendants are dismissed.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DON R. ICKES, | ) | |
| | ) | CIVIL ACTION NO. 3:13-208 |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| CRAIG GRASSMEYER, BARRY | ) | |
| AUGNST, THOMAS LASKEY, and | ) | |
| RONALD GIVLER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this 11th day of August, 2016, upon consideration of Defendants'

Motions for Summary Judgment (ECF Nos. 44, 48), and in accordance with the foregoing

Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendants' Motions are **GRANTED**,

and Plaintiff's claims against Defendants Grassmyer, Augnst, Laskey, and Givler are

**DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of

Defendants Craig Grassmyer, Barry Augnst, Thomas Laskey, and Ronald Givler, and against

Plaintiff Don R. Ickes, and shall mark this case closed.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE